STEVENS TECHNICAL SERVICES, INC. Plaintiff–Appellant,

v.

UNITED STATES of America, as Owner of the U.S.N.S. SEALIFT ANTARCTIC, its engines, etc., in rem, and Atlantic Sandblasting & Coatings, Inc., in personam, Defendants–Appellees.

No. 87–3359.

United States Court of Appeals, Eleventh Circuit.

Oct. 10, 1990.

---

1522

David F. Pope, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff-appellant.

Gary J. Takacs, Asst. U.S. Atty., Tampa, Fla., Stephanie J. Grogan, Admirality Section, Torts Brach/Civil Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Edward F. Gerace, Tampa, Fla., for Atlantic.

Before ANDERSON, Circuit Judge, and BROWN *, Senior Circuit Judge.**

JOHN R. BROWN, Senior Circuit Judge:

### The Prelude

In a nutshell, the government's theme can be simply capsulated: A maritime lien claim for repairs to a vessel requires seizure and arrest of the vessel to effectuate it. Since governmentally owned and operated vessels [1] and public [2] vessels cannot be seized or arrested the lien cannot be enforced, hence, no governmental liability. Finally, a libel *in persoman* on principles of *in rem* libel authorized by both SIA and PVA is not permitted. Consequently, the District Court—disregarding that SIA—PVA which permits a libel (complaint) *in personam* on principles of *in rem* —was right in dismissing the libel (complaint).

### The Past is Indeed Prologue

The government's position, successfully maintained below, and reasserted here, flatly ignores principles established 45 years ago.

In *Canadian Aviator, Ltd. v. United States,*[3] Justice Reed dealing with PVA pinpointed the critical issue the answers to which also solve the instant case:

The dismissal by the lower court of petitioner's libel raises three questions for consideration by this Court:

[1] Does the Public Vessels Act, 1925, [PVA] authorize suit against the United States where the public vessel is not the physical cause, the "physical instrument" by which the damage is done; that is, is the Act confined to cases involving the collision situation?

[2] If not, does the Act, which authorizes the filing of a libel *in personam* against the United States, authorize recovery in such suit on admiralty principles of in rem as well as *in personam* liability?

[3] Finally, if the Act authorizes recovery on admiralty principles in rem and in personam does petitioner's libel state cause of action under those principles of admiralty law?

*Id.* 324 U.S. at 218, 65 S.Ct. at 641, 89 L.Ed. at 905.

Later, the Court, pointing out that the petitioner was evidently relying on § 2 of the Act to state in its libel the election to have the action proceed on principles of *in rem* as well as *in personam* liability specifically referred to the Court of Appeals holding "that the Act does not authorize recovery on principles of *in rem* liability because of the statutory denial [§ 788] of a maritime lien ..."—the very contention now made 45 years later by the government. The Court then answering the first of its decisive questions phrased it this way:

Does the [PVA] which authorizes filing of a "libel in personam" authorize the courts to apply principles of in rem as well as in personam liability in admiralty?

*Id.* at 226, 65 S.Ct. at 645, 89 L.Ed. at 909. The answer, the Court reasoned, brought into play §§ 2 [4] and 3 [5] of the Suits in Admiralty Act (SIA).

---

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

** Judge Robert S. Vance was a member of the panel which heard oral argument but due to his death on December 16, 1989 did not participate in this decision. This case is decided by a quorum. *See* 28 U.S.C. § 46(d).

1. 46 U.S.C.App. § 741, *see, infra,* n. 7.

2. 46 U.S.C.App. § 781, *see, infra,* n. 15, and related text.

3. 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945).

4. Section 742, Libel *In Personam,* provides, in pertinent part:

In cases where if such vessel were privately owned or operated ... a proceeding in admiralty could be maintained, any ... proceeding *in personam* may be brought against the United States.... Such suits shall be brought in the district court of the United States....

■ Although PVA does not have a specific provision similar to SIA § 743, PVA has § 782 [6] which expressly provides that PVA "suits shall be subject to and proceed in accordance with the provisions" of the SIA, "insofar as the same are not inconsistent" with the provisions of PVA.

The Court then concludes with this sweeping declaration:

> Since there is nothing in the [PVA] that is inconsistent with this provision of the [SIA], we hold that the incorporation clause applies.

324 U.S. at 227, 65 S.Ct. at 645, 89 L.Ed. at 910. This means that for nearly half a century the PVA authorized a libel (complaint) *in personam* against the government to be determined on principles of both *in personam* and *in rem* liability under the maritime law.

Both PVA and SIA have substantially the same provisions forbidding seizure or arrests of a ship involving either a pre–1960 "merchant vessel" [7] or a public vessel.[8] *Canadian Aviator* concludes with emphasis, "we hold that the [PVA] was intended to impose on the United States the same liability (*apart from seizure or arrest under a libel in rem*) as is imposed by the admiralty law on the private shipowner...." 324 U.S. at 228, 65 S.Ct. at 646, 89 L.Ed. at 910 (emphasis added).

**5.** Section 743, Procedure in Cases of Libel *In Personam*, provides, in pertinent part:

> Such suit shall proceed ... and [be] determined according to the principles of law and to the rules of practice obtaining in cases between private like parties.... If the libelant [plaintiff] so elects in his libel, the suit may proceed in accordance with the principles of libels in rem wherever it shall appear that had the vessel ... been privately owned ... a libel in rem might have been maintained.... [T]he, United States ... shall [not] be required to give any bond or admiralty stipulation on any proceeding brought hereunder.

**6.** Section 782, applying provisions of chapter 20, provides, in pertinent part:

> Such suit shall be brought in the district court ·of the United States.... Such suits shall be subject to and proceed in accordance with the provisions of chapter 20 [PVA] of this title or any amendment thereof, insofar as the same are *not inconsistent herewith....*

## No Lien Clauses Are SIA–PVA Centered

■ Here again what happened—not 45 years ago, but over 70—determines that the no-lien clause of SIA and PVA are directly related to and draw their meaning and limitation from inclusion in these Acts. They are in no sense a prohibition on the creation or existence of a maritime lien. They each assure that there can be no arrest or seizure of a government vessel.

■ We go back to *The Lake Monroe*.[9] Congress, seeking a way to avoid the numerous applications for private bills for shipping claims, provided in the Shipping Act of 1916 [10] that such vessels "... while employed solely as merchant vessels, shall be subject to all laws, regulations, and liabilities governing merchant vessels." The Court in *Lake Monroe* held that this statutory waiver of sovereign immunity subjected these government vessels to the usual proceedings *in rem* in admiralty. The Supreme Court denied a writ of prohibition against the seizure of a government vessel under the 1916 Act. Thus the SIA was born. *Canadian Aviator, supra,* explained it, "[s]ince the arrest and seizure of a vessel incident to an admiralty proceeding in rem proved embarrassing, Congress in 1920 adopted the Suits in Admiralty

(Emphasis added).

**7.** Section 741, Exemption of United States Vessels and Cargo from Arrest or Seizure, provides, in pertinent part:

> No vessel owned by the United States ... or in the possession of the United States ..., and no cargo owned or possessed by the United States ... shall, in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States or its possessions.

**8.** Section 788, Lien Not Created Against Public Vessels, provides:

> Nothing contained in this chapter shall be construed to recognize the existence of or as creating a lien against any public vessel of the United States.

**9.** *The Lake Monroe (Re: United States),* 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962 (1919).

**10.** 39 Stat. 728, c. 451, codified at 46 U.S.C.App. § 801 et seq.

Act." 324 U.S. at 219, 65 S.Ct. at 642, 89 L.Ed. 906.

Referring to *Lake Monroe* and *Eastern Transportation Co. v. United States*,[11] *Canadian Aviator* held:

> Although § 2 [§ 742] of [SIA] limited suit to the filing of a 'libel in personam' this Court interpreted the provisions of § 3 [§ 743], of the Act to authorize recovery in such suit on admiralty principles of in rem as well as in personam liability.

324 U.S. at 220, 65 S.Ct. at 642, 89 L.Ed. at 906.

So as we raise the curtain to unfold the facts on which to apply the decisive principles, the law concerning public vessels under PVA is now, and has been for nearly half a century:

> PVA automatically incorporates the procedure of §§ 2 and 3 [§§ 742 and 743] of SIA.
>
> A libel (complaint) in personam with in rem election may invoke principles of a libel in rem.
>
> The no lien clause of PVA, § 788, and the no seizure clause of SIA, § 741, relate to a SIA–PVA proceeding against the government.
>
> A PVA libel (complaint) in personam with in rem election can effectually enforce a maritime lien.

## I.

### The Litigation

The District Court entered judgment against the ship repairer[12] [Stevens] on its libel (complaint) *in personam* with an election to proceed on principles of *in rem* for repairs to a public vessel, U.S.S. SEALIFT ANTARCTIC. The trial court held that under PVA an *in personam* suit with *in rem* election could not lie against the United States to recover on a maritime lien for

11. 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472 (1926).

12. For Part I, we assume that Stevens, as the principal subcontractor, has a maritime lien. That question is deferred to Part II.

13. It is uncontested that the SEALIFT ANTARCTIC, an auxiliary tanker, was at all material

repairs to a public vessel since effectuation of lien would require arrest and seizure of the vessel prohibited by § 788.

### In the Beginning

■ The SEALIFT ANTARCTIC is a public vessel of the United States.[13] It is demise chartered to the United States through the Military Sealift Command (MSC), a subdivision of the United States Navy, and operated by Marine Transport Lines, Inc. (MTL).

In 1984, the SEALIFT ANTARCTIC was scheduled for a major overhaul, including tank cleaning, repainting and coatings and major engine and machinery work. On January 14, 1985, in response to a solicitation for repair work bids issued by MTL, Atlantic submitted a bid to carry out and complete the specified repairs for an agreed price. The bid submitted by Atlantic, as required by the bid solicitation, identified Stevens as a subcontractor performing more than 15 percent by dollar value of the specified repair work.

On January 16, 1985, Stevens and Atlantic entered into a memorandum agreement which, among other things, provided for division of the repair items between Atlantic and Stevens, with the Atlantic items totaling approximately $578,000, and the Stevens items totaling approximately $580,000. The Atlantic contract was accepted and approved by government agencies, and on February 15, 1985, MTL awarded the job to Atlantic for the work to be done by Atlantic and Stevens.

The repairs were performed at Atlantic's repair facility in Tampa, Florida. During the course of the repair work on the SEALIFT ANTARCTIC the government was represented by employees of MTL and MSC who inspected, tested and approved the

times a public vessel of the United States. This vessel has been engaged exclusively in the carriage of Department of Defense petroleum products to military facilities, which are used to supply naval vessels, aircraft, and other military vehicles of the Army, Navy and Air Force. Since the vessel was launched, it has never carried privately owned cargo.

work performed by both Atlantic and Stevens. Following completion of the repairs, the SEALIFT ANTARCTIC departed from the Port of Tampa and proceeded to Mobile, Alabama, where, at the request of representatives of the vessel, Stevens adjusted and corrected certain deficiencies in the repair work Stevens had performed. MTL paid the full contract price to Atlantic and was reimbursed for this full amount by the MSC. Atlantic failed to pay Stevens the balance owed on Stevens' contract. In July 1985, Stevens filed this action against Atlantic, *in personam*, and the United States, as owner of SEALIFT ANTARCTIC, *in rem*,[14] to recover the balance due.

After a bench trial, the District Judge, Anthony Alaimo entered judgment against Atlantic for the amount due, but ordered that Stevens take nothing in its quasi *in rem* action against the United States. The District Court concluded that Stevens was not entitled to recover against the SEALIFT ANTARCTIC *in rem* and, therefore, dismissed the claim against the United States.

*The PVA Specifically Authorizes Maritime Liens to be Effectuated by In Personam Claim with In Rem Election*

We need not—as we shortly do—trace the judicial history of PVA to determine whether Congress by enacting § 788, *supra*, n. 8, meant either to (i) prohibit all maritime liens, or somehow, (ii) carve out from the allowance of claims generally creating a maritime lien, those growing out of an engagement for repairs to a public vessel.

The statute § 781 provides the answer: A libel in personam in admiralty may be brought against the United States … for damages caused by a public vessel of the United States, and for [i] compensation for [a] towage and [b] salvage services, including [c] contract salvage, rendered to a public vessel of the United States.

46 U.S.C.App. § 781.[15]

It does not strain principles of legislative history to conclude that in the 1925 PVA, reference to maritime liens brought automatically into consideration the principles of the recently-enacted (1920) Federal Maritime Lien Act (FMLA) 46 U.S.C.App. §§ 971–975. Significantly, the FMLA covered "repairs, supplies, towage, use of dry dock or marine railway, or other necessaries…." 46 U.S.C.App. § 971.

Of the enumerated items in § 781 the first, [a] towage both before and after FMLA, is recognized as giving rise to a maritime lien.[16] So, too, is [b] "salvage services." [17] The nature of salvage reflects the necessity for an *in rem* type of proceeding dealing, as it does, with the rights and liabilities of literally hundreds of interests such as cargo, freight and hull on which finding, tracing or serving the countless interests, e.g. cargo, in an *in personam* proceeding would be impossible. As to [c] "contract salvage," it, too, gives rise to a maritime lien, *id.* at 738, although the trial judge is afforded considerable liberty in reducing the contract compensation if deemed excessive.

Since claim for salvage gives rise to a lien and it is specifically allowed in PVA, Congress must have intended that that sort of a lien could still be asserted notwithstanding the no lien clause. The same is true since § 781 expressly covers collision. GILMORE AND BLACK, p. 628.

Having specifically recognized three (e.g., [a], [b] and [c], *supra*) situations giving rise to a maritime lien, Congress

---

14. While the complaint specified the action to be against the vessel in rem, no writ or warrant of arrest was issued by the clerk of court, nor was the vessel ever seized.

15. Brackets are added for ease of reference.

16. GILMORE AND BLACK, THE LAW OF ADMIRALTY, 2d Ed.1974 at 630.

17. *See Id.*, at 532–85. Indeed, for priority, salvage "ranks second in the order of priority on the theory that the salvor has preserved the property for the benefit of all claimants." *Id.* at 738.

must have meant the purpose of § 788, *supra*, n. 8, and related text forbidding the creation of a maritime lien, was to forbid any misguided effort physically to arrest or seize a public vessel. See, *The Lake Monroe, supra*, n. 9, and related text.

To attribute any other meaning to § 788 is to both grant a remedy [§ 781] and simultaneously take it away [§ 788].

### What We Hold What We Do Not Hold

In considering the massive material that follows, it is important to emphasize from the beginning WHAT WE HOLD and WHAT WE DO *NOT* HOLD:

We hold:

PVA applies to and controls this public vessel case.

PVA controls with all of its restrictive provisions.

PVA § 788 is directly applicable.

Section 788 concerns, as does SIA § 741, primarily prohibition of arrest or seizure to effectuate PVA objectives.

We do *NOT* hold:

Incorporation of SIA does or could avoid or eliminate § 788 in a PVA case which this one is.

The question then is reduced to:

Does § 788 in the light of SIA and PVA prevent the assertion of a maritime lien for repairs to a public vessel in a PVA suit in personam with election for in rem liability?

### Genesis of SIA and PVA

Once upon a time, suits against the United States were barred by principles of sovereign immunity. Over a period of years, the United States has, by a variety of statutes, waived sovereign immunity and consented to be sued in one tribunal or another, for a vast variety of claims.

The history of the 1920 SIA and the 1925 PVA is so thoroughly documented by the Supreme Court in *Canadian Aviator*,[18]

and *American Stevedores, Inc.*,[19] and more recently in *United Continental Tuna Corp.*,[20] it may be briefly capsulated. Congress, in the years following World War I, then the owner of a substantial fleet of merchant vessels, was faced with thousands of private bills for recovery of damages growing out of the operation of these ships. Congress enacted the Shipping Act of 1916[21] to handle this situation which provided that Shipping Board vessels employed as merchant vessels were subject to "all laws, regulations and liabilities governing merchant vessels." Although this was an adequate forerunner to subject the government to liability, that objective was soon curtailed by the Supreme Court's decision in *Lake Monroe, supra*, n. 9. That case held, in effect, that the waiver of sovereign immunity was so broad as to subject government owned and operated vessels to arrest and seizure.

As this was both unsatisfactory and embarrassing, Congress soon enacted the SIA in 1920. It was simple in design. With *Lake Monroe* fresh in its mind, Congress provided in § 741, *supra*, n. 7, that "[n]o vessel owned by the United States shall, in view of the provision for a libel *in personam* be subject to arrest or seizure...." Section 742, *supra*, n. 4, permitted a libel *in personam*, and § 743, *supra*, n. 5, provided that such *in personam* suit should be "heard and determined" according to principles of law obtaining in like cases between private parties and, of great importance here, expressly provided that on election by the libelant "the suit may proceed in accordance with the principles of libels *in rem*" wherever had the vessel been privately owned a libel *in rem* might have been maintained.

Until 1925, however, there was no recourse against the government for damages from operation of a public vessel. As to them Congress was once again faced

---

**18.** *See, supra*, n. 3, 324 U.S. at 218–22, 65 S.Ct. at 641–43, 89 L.Ed. at 905–07.

**19.** *American Stevedores, Inc. v. Rosario Porello*, 330 U.S. 446, 450–54, 67 S.Ct. 847, 849–52, 91 L.Ed. 1011, 1016–18 (1947).

**20.** *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 170–78, 96 S.Ct. 1319, 1323–27, 47 L.Ed.2d 653, 659–64 (1976).

**21.** *See, supra*, n. 10.

with numerous private bills. This led to the enactment of PVA. Like SIA, the PVA under § 781, authorized a libel *in personam* against the government "for damages caused by a public vessel," *supra*, n. 15 and related text. Recognizing the closeness between SIA and PVA, § 782, *supra*, n. 6, brought in the SIA by providing that suits under PVA "shall be subject to and proceed in accordance with the provisions of [SIA] ... insofar as the same *are not inconsistent herewith....*" (Emphasis added).

### 1960 Amendments to SIA

Then came the 1960 amendments to SIA resulting in the deletion of the clause "provided that such vessel is employed as a merchant vessel" in §§ 742 and 743, *supra*, nn. 4 and 5. Although enacted principally to eliminate the vexing controversies over just when a vessel was a "merchant vessel," see, *Calmar Steamship Corp. v. United States*,[22] and the even more troublesome jurisdictional conflicts with the District Court sitting in admiralty and the Court of Claims, for contract or related actions under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491, and the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b), 2671 *et seq.*,[23] it has a vital significance in the application of PVA. Except for the restrictive provisions relating to the specific functions of a public vessel generally under control of military authorities, this amendment covers all vessels owned or operated by the government, whether acting in the capacity of a typical freight-earning ship or in the capacity of a public vessel under control of military authorities.

### Judicial Application PVA, SIA Generous, Not Hypercritical

Not only has Congress been liberal in its efforts to initiate the widest possible waiver of sovereign immunity for suits against government vessels, the Courts have been equally generous. There is no judicial precedent for establishing, 65 years later, that the 1925 PVA cannot apply because the *in rem* suit as authorized would, to effectuate it, theoretically require seizure and arrest of the vessel which is so positively forbidden by §§ 741 and 788 (nn. 7 and 8, *supra*).

The first challenge came in 1945, with *Canadian Aviator*, n. 3, *supra*, in which the government seriously contended there was no PVA coverage for damage sustained by the following vessel under orders to follow directly astern of the patrol boat YP 249 due to the negligence of and the escorting naval patrol vessel. Besides raising and answering the three critical questions, *see, supra*, n. 1 and related text, the Court proceeded to deal with the government's contention that PVA allowed suits against the United States only "for damages caused by a public vessel" which meant only where the public vessel is the "physical instrument" by which damage is done, e.g. collision. 324 U.S. at 222, 65 S.Ct. at 643, 89 L.Ed. at 907. The Court responded:

> We conclude that such a narrow interpretation of the Act is not justifiable.... [W]e think congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation.

*Id.* (citations omitted).

Giving it the broadest brush possible, the Court continued:

> The consent to suit embodied in the Act thus extends to cases where the negligence of the personnel of a public vessel in the operation of the vessel causes damage to other ships, their cargoes, and personnel, regardless of physical contact between the two ships, and where principles of admiralty law impose liability on private parties. There seems no logical reason for allowing recovery for collision and refusing recovery for damages

---

**22.** 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953).

**23.** *See*, S.Rep. No. 1894, 86th Cong. 2nd Sess., 1960 U.S.Code Congressional and Administrative News, p. 3583, *et seq.* and n. 8; *DeBardeleben Marine Corp. v. United States*, 451 F.2d 140, 143 (5th Cir.1971).

caused by other movements of the offending vessel.

*Id.* at 224–25, 65 S.Ct. at 644, 89 L.Ed. at 909.

While *Canadian Aviator* indicated the broadest concept of causation and physical damage, seven years later, in *Calmar S.S. Corp. v. United States, supra,* n. 22, the Court drew back somewhat. "It is not to be assumed that all claims sounding in contract can form the basis of a suit under the Public Vessels Act. The Act expressly authorizes towage and salvage claims. We intimate no opinion as to other claims...." 345 U.S. at 456, n. 8, 73 S.Ct. at 738, n. 8, 97 L.Ed. at 1147, n. 8.

*Calmar* involved a libel brought under the SIA concerning a privately-owned vessel operated for the United States for hire and used exclusively for the carriage of war materiel rejecting prior contradictory actions of the district court and appellate court. The Supreme Court held that even though it was engaged in a war mission, it was, nevertheless, a "merchant vessel" eligible to proceed under the SIA. *Id.*

In *American Stevedores, supra,* n. 19, the Court was confronted with the claim of Porello, a longshoreman injured while working in the hold of a public vessel. He had first received compensation checks under LHWCA, 33 U.S.C. §§ 901–950, but thereafter gave notice, 33 U.S.C. § 933(a), of his election to sue the United States as a third party tortfeasor. The government first claimed sovereign immunity and that by earlier accepting compensation, Porello had lost his right to sue it as a third party tortfeasor. To the Court, the important issue was whether the PVA makes the United States liable for damages on account of personal injuries. Sounding the broad purpose of the enactment of SIA and PVA the Court characterized them as "as attest[ing] ... the growing feeling of Congress that the United States should put aside its sovereign armor in cases where

federal employees have tortiously caused personal injury or property damage." 330 U.S. at 453, 67 S.Ct. at 851, 91 L.Ed. at 1018.

The Court concluded that PVA read in the light of its legislative history evinces no "congressional intent ... to provide [only] a remedy to the owners of damaged property". *Id.* Nor does acceptance of compensation preclude the injured employee from suing under PVA. *Id.*

Although the Court was unable to resolve the indemnity claim asserted by the government against the contracting stevedore, it is evident that the Court was not troubled that on adequate proof PVA would encompass such a contractual, or at least quasi-contractual claim.[24] Argued and treated was also the *Lauro* case on certificate from the Second Circuit. The Court held that PVA afforded relief under PVA for maritime death as permitted under the New York Death Act.

Probably the most important decision reflecting the admiralty-based concept of PVA and SIA is *Weyerhaeuser Steamship Co. v. United States,*[25] where a government employee on an army dredge after first receiving federal employees compensation collected $16,000 from the private shipowner because of the collision between the dredge and that vessel. The collision was thereafter determined to be a result of mutual fault. The non-employing vessel included that sum in its damage claim to which the divided damage rule would apply. The government contended that the usual admiralty rule had been qualified by § 7(b) of the Federal Employees Compensation Act[26] which provides that the liability of the United States for "injury or death of an employee shall be exclusive, and, in place of all other liability of the United States entitled to recover damages from the United States on account of such injury or death."

*Id.* at 458, 67 S.Ct. at 854, 91 L.Ed. at 1021.

**24.** The Court stated:
   If the District Court interprets the contract not to apply to the facts of this case, the Court would, of course, be free to adjudge the responsibility of the parties to the contract under applicable rules of admiralty law.

**25.** 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963).

**26.** 5 U.S.C. § 757(b).

The Ninth Circuit held that since § 7(b) of the Federal Employees Compensation Act was the exclusive basis for liability, the payment made by the third party to a government seaman could not be included in the damage claim since that would make the government liable for amounts in excess of the Compensation Act. *Weyerhaeuser*, 372 U.S. at 599–600, 83 S.Ct. at 927–28, 10 L.Ed.2d at 4.

In the Supreme Court the government argued that, "with respect to the amount paid [the employee] the established admiralty rule has been qualified by § 7(b) of the Federal Employees Compensation Act," which provides that liability under the Compensation Act shall be exclusive. *Id.* at 599, 83 S.Ct. at 927, 10 L.Ed.2d at 3–4.

Dealing with § 7(b), the Court stated it was:

> added ... to establish that, as between the Government on the one hand and its employees ... on the other, the statutory [compensation] remedy was to be exclusive.

However:

> There is no evidence that whatever that Congress was concerned with the rights of unrelated third parties, much less of any purpose to disturb settled doctrines of admiralty law....

*Id.* at 601, 83 S.Ct. at 929, 10 L.Ed.2d at 5.

The Court granted certiorari "to consider the single question whether the historic admiralty rule of divided damages ... has been qualified ... by the exclusive liability provision of the federal compensation statute." *Id.* at 600, 83 S.Ct. at 928, 10 L.Ed.2d at 4. Reverting to the *Canadian Aviator* holding that PVA "was intended to impose on the United States the same liability (apart from seizure or arrest under libel in rem) as is imposed by the admiralty law on the private shipowner ...," the Court proceeded to hold that "there can be no question that a private shipowner in a case such as this would be liable for half of all the petitioners' provable damages...." *Id.* Applying this 100 year old admiralty rule, the Court applied *The Chattahoochee*,[27] which allowed the non-carrying vessel to include in its damage claim the amounts paid for cargo loss/damage notwithstanding the exoneration of the carrying vessel under the Harter Act[28] for cargo damage resulting from error or faults in navigation. The carrying vessel must share, under the Divided Damages Rule, the damages incurred by the non-carrying vessel. *Weyerhaeuser*, 372 U.S. at 604, 83 S.Ct. at 930, 10 L.Ed.2d 6–7.

Dealing with questions of venue and possible jurisdiction, *Blamberg Brothers v. United States*[29] held that SIA did not authorize an *in personam* suit against the United States *as a substitute for a libel in rem*, when the government vessel was not in the port of the United States or one of its possessions at the time of filing the libel. *Nahmeh v. United States*,[30] a libel for personal injuries, was filed in the Eastern District of New York whereas the S.S. Quinnipiac was then in the Southern District of New York. The government objected to jurisdiction on the ground that the libel did not show that the vessel was at the date of filing the libel within the Eastern District of New York. Although it was the residence of the claimant, this brought into direct question the Second Circuit decision in [The] *Isonomia* [285 F. 516 (2nd Cir.1922)] which, construing § 2 [§ 742], held that the provision by which the suits might be brought in the District Court in which a vessel charged with liability was found should be held to afford the *only* place for jurisdiction "in a suit *in personam* against the United States which was substituted by the Act for a suit against the vessel *in rem.*" 267 U.S. at 125, 45 S.Ct. at 278, 69 L.Ed. at 538. In restricting *Isonomia*, the Court announced:

**27.** 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899).

**28.** 46 U.S.C.App. § 102; substantially re-enacted in § 4(2)(a) of COGSA, codified at 46 U.S.C.App. § 1304(2)(a).

**29.** 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346 (1923).

**30.** 267 U.S. 122, 45 S.Ct. 277, 69 L.Ed. 536 (1925).

These liberal provisions indicate that the language used in the section should have its broad and ordinary meaning and should not be interpreted in a restrictive and distributive sense. We think, therefore, that the suit brought in the district where the libelant resided was a suit brought in accordance with Section 2, [§ 742] *even though it would have been an action in rem between private parties*, and that it made no difference where the vessel then was, provided only that it was within the jurisdiction of the United States.

267 U.S. at 126, 45 S.Ct. at 278, 69 L.Ed. at 538 (emphasis added).

### Lower Federal Courts Equally Generous

In *United States v. The Australia Star: The Hindoo*, 172 F.2d 472 (2d Cir.1949), involving a war time (1944) collision in the Caribbean Sea between the S/S HINDOO, a government vessel, and the S/S AUS-TRALIA STAR under blackout conditions, the HINDOO and AUSTRALIA STAR were held equally at fault but the naval escort vessel, PC–616, was exonerated. Holding the escort vessel negligent in failing to signal the HINDOO or give warning to the AUSTRALIA STAR, the Court then did an interesting thing following the rule that where two vessels of the same ownership contribute to a disaster, the vessel owner may not limit liability without surrending his interest in both vessels: it altered the judgment to provide instead of 50/50 fault a 1/3/1/3/1/3 judgment.

In *Ira S. Bushey & Sons, Inc. v. United States*,[31] Judge Friendly, for the Court, held the government liable for extensive damage to a Coast Guard vessel, then in dry dock, when it slid off the blocks striking and damaging the dry dock wall. It came about when an inebriated sailor opened a number of "wheels" to valves controlling the flood gate valve causing the dry dock to sink. The trial court, by an interlocutory decree deferring determination of damages, held the government liable. *Id.* at 168. If the liability arose under the Federal Torts Claims Act (FTCA) and not the SIAPVA, the Court would have no appellate jurisdiction from a non-final judgment. Consequently, it was necessary for the Court to determine applicability of SIA and PVA. The trial judge ruled that the government's cross-claim for damage to the dry dock was not "caused by a public vessel of the United States" since "the Tamaroa was not, in a practical sense, a ship causing a 'collision' but an inert mass." *Id.* Since entering the decree determining liability (but deferring damages) was insufficient to afford jurisdiction of an appeal under the FTCA, 28 U.S.C. § 1292(a)(3), the Court concluded "[w]e perceive no basis for the court's restrictive reading of the Public Vessels Act" and held that even if PVA did not warrant the suit it "could nevertheless be maintained under § 2 of [SIA]." *Id.* at 169. After extensive analysis of tort principles, the Court concluded that "it was foreseeable that crew members crossing the dry dock might do damage, negligently or even intentionally," thus to hold the government liable under SIA, PVA or both. *Id.* at 172. The Court found it unnecessary to consider that where "libels *in rem*, whose principles are here applicable by virtue of § 3 of the [SIA], ordinary rules of agency are inapplicable and the ship is liable for anything shipconnected persons cause it to do." *Id.* at 173 (*citing The China*, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1869)).

Gilmore and Black's treatise reflects the generous reading Courts have given to SIA and PVA. GILMORE AND BLACK, THE LAW OF ADMIRALTY, 2d Ed.1974, 982–86. It provides that recovery *in personam* may be had against the United States where either an *in rem* or an *in personam* liability would have risen on the same facts as against a private owner: "Obviously, the pattern of this statement supports the statement … that the government, in entering the shipping world as a participant, simply assumes a normal role in the antecedent pattern." *Id.* at 982.

---

**31.** 398 F.2d 167 (2d Cir.1968).

*Judicial Precedent Excluding PVA and SIA Liability Based on Intrinsic Provisions of PVA or Major Statutory Exclusion Not on Sovereign Immunity*

There are, of course, decisions which exclude certain types of claims from liability under PVA and SIA. In none of them is the exclusion based on sovereign immunity. Rather, in each case it is either a specific restrictive provision of PVA or some comprehensive statutory structure excluding from SIA–PVA liability an otherwise valid maritime claim.

First, there was the situation of injury to a civilian employee of the government while working as a crew member on a public vessel, such as a troop transport, army tug, or the like. The Court in *Konrad G. Johansen v. United States,*[32] held that the Federal Employees Compensation Act (FECA),[33] forbad liability under PVA. The Court, disapproving a contrary decision of the Fourth Circuit in *Johnson v. United States,*[34] but acknowledging that the claims came within the literal language of PVA-SIA, determined that in the 1925 enactment of PVA, Congress had not thought that it was conferring "additional rights on claimants entitled to the benefits of the Federal Employees Compensation Act of 1916." *Johansen,* 343 U.S. at 431–32, 72 S.Ct. at 853, 96 L.Ed. at 1056. After examining in detail the structure of FECA, the Court held that despite the Senator Morse Amendment,[35] the 1949 Amendments added a new § 7 to provide clearly that the liability of the United States under FECA shall be exclusive of all other liability of the United States. Fulfilling the purpose of the 1949 Amendments, the Court concluded:

> All in all we are convinced that the Federal Employees Compensation Act is the exclusive remedy for civilian seamen on public vessels.

343 U.S. at 441, 72 S.Ct. at 857, 96 L.Ed. at 1061.

*Harry J. Amell v. United States,*[36] offers an interesting twist. There federal employees working aboard government vessels filed actions for wages, overtime, and bonuses in the Court of Claims under the Tucker Act. The government filed motions to have the actions transferred to federal district courts under the SIA on the ground that the claims were of a maritime nature justiciable exclusively under SIA where, of course, the claims would be barred by the two-year statute of limitations in contrast to the six-year statute of limitations in the Court of Claims. Obviously conscious that declaring SIA applicable would entirely defeat the claims as time-barred, the Court concluded that "we believe the traditional treatment of federal employees by the Government tips the balance in favor of Court of Claims jurisdiction." 384 U.S. at 166, 86 S.Ct. at 1389, 16 L.Ed.2d at 450.

This brings us to *United States v. United Continental Tuna Corp.,*[37] as warmly embraced by the government as it is by us. In a suit for collision between a United States destroyer and a vessel owned and operated by a Philippine corporation the Court held PVA's reciprocity provision, 46 U.S.C.App. § 785,[38] forbad recovery under PVA. Contrary to the Ninth Circuit, it reasoned that the 1960 amendment to SIA

---

**32.** 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952).

**33.** 39 Stat. 742, 5 U.S.C. §§ 751 *et seq.*

**34.** 186 F.2d 120 (4th Cir.1950).

**35.** The amendment added a new subsection to 63 Stat. 854 which concluded:
> *Provided, however,* that this subsection shall not apply to a master or a member of the crew of any vessel.

**36.** 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966).

**37.** 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976).

**38.** Section 785, which covers suits by nationals of foreign governments, provides:
> No suit may be brought under this chapter by a national of any foreign government unless it shall appear to the satisfaction of the Court ... that said government, under similar circumstances, allows nationals of the United States to sue in its courts.

46 U.S.C.App. § 785.

did not permit suits cognizable under PVA to be brought under SIA free from the restrictive provisions of PVA. The Court analyzed at length the 1960 Amendments to SIA and concluded:

Congress' deletion of the "employed as a merchant vessel" proviso was clearly intended to remove such uncertainty as to the proper forum by bringing within the [SIA] whatever category of claims involving public vessels *was beyond the scope of the Public Vessels Act.*

425 U.S. at 180–81, 96 S.Ct. at 1328, 47 L.Ed.2d at 665 (emphasis added).

Thus, through SIA, the amendment did bring in claims against public vessels greater rights than imposed in PVA. But the Court carefully pointed out that "claims like the instant one," i.e., collision with a foreign vessel which was expressly "within the PVA," was not the problem with which Congress was concerned in the 1960 amendments. If a claim was within PVA prior to 1960, it necessarily included the restrictive reciprocity provisions of PVA. Necessarily, the reciprocity provision continued to apply. As the Court phrased it:

We therefore hold that claims within the scope of [PVA] remain subject to its terms after the 1960 amendments to [SIA].

425 U.S. at 181, 96 S.Ct. at 1329, 47 L.Ed.2d at 666.

### Reviving the Specter of More Private Bills For Congress of Ships Bare Boat Chartered to the United States

The government's contention that the no lien clause for a public vessel, 46 U.S.C. App. § 788, *supra,* n. 8, forbids the use of the libel *in personam* on principles of *in rem* liability as permitted under §§ 742 and 743, *supra* nn. 4 and 5, is no victory for the government. For PVA cases now effectively incorporated in SIA, the government will escape damages under PVA, SIA, or both. But it would directly increase the number of private bills to be handled by Congress in its largess. Today, as in the instant case, the government obtains the use of a privately-owned vessel such as a tanker or the like to perform military functions under a bare boat charter which makes the government the owner *pro hac vice.* The commercial-like operation of such public vessels will expose the ships to the usual run-of-the-mill maritime risks, including damage from collisions or damage to shore structures, docks and piers. That will, for example, include the mandatory use of a state-compulsory pilot.

Suppose, for example, that a tanker of the size of U.S.S. SEALIFT ANTARCTIC navigating the Houston ship channel conned by a Texas compulsory pilot crashes into a tanker at a major petroleum dock doing hundreds of thousands of dollars in damage, both afloat and ashore. Notwithstanding the existence of the Extension of Admiralty Act, 46 U.S.C.App. § 740, the government would be liable if the suit were the equivalent of one *in rem, The China,* 74 U.S. (7 Wall.) 53, 19 L.Ed. 67, but would walk off scott free on a suit *in personam* because of the actions of an involuntary servant, *Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique,* 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901). Nor as actions of an involuntary servant would there be any liability under FTCA.

The upshot would be that after suits on the admiralty side of the district court and belated efforts in the claims court with a foray under the FTCA, it would be back in the halls of Congress. One could understand the frustration of some knowledgeable senator who might exclaim,

What are we doing here? I though our predecessors in 1925 had sent such cases to the admiralty courts.

The reverse occurred below when the trial judge, Anthony Alaimo, a skilled, long-experienced District Judge, near the end of the case and during argument of counsel almost blurted out:

*The Court:* Tell me why in the world there is not a single case cited under that section [§ 788]?

*Government Counsel:* I wish I knew.

*The Court:* Can you explain that?

To which government counsel meekly (but honestly) could only reply:

*Government Counsel:* No, I can't, I really can't. We have looked for them. We can't find them. We can't find any legislative history.

### No Articulate Precedents That Section 788 Prohibits Enforcement of Maritime Lien in a PVA With In Rem Included in Suit

Arrayed against this voluminous history of SIA and PVA, the very terms of each, and judicial precedents which speak without equivocation, the government can find and hence cite only two cases as justification for its position that § 788 prevents an effective enforcement of a maritime lien so no right of recovery can be had under a PVA § 781 suit including principles of *in rem* liability.

One is *River & Offshore Services Co. v. United States.*[39] It is true that Judge Sear so declares, but his reasoning is a simple query and answer all rolled into one:

> 46 U.S.C. § 788 forbids liens against public vessels. Section 788 provides, "Nothing contained in this chapter shall be construed to recognize the existence of or as creating a lien against any public vessel of the United States." Therefore, the United States is entitled to summary judgment dismissing the maritime lien claims against the United States.[40]

The other case cited is *B.V. Bureau Wijsmuller v. United States of America as Owner of the Warship Julius A. Furer,*[41] which reflects disservice to Judge Haight, a long-experienced, competent maritime lawyer who began in—and probably yearns for—the days of proctors. The question was whether, under PVA, the District Court had the power to order arbitration (and deposit for costs) under the Lloyd's Open Form ("LOF") salvage agreement signed by the captain of the warship for performance of salvage services. As Judge Haight described it, "[t]he government contends that it is not bound by the

LOF or the provisions for arbitration which it contains." *Id.* at 2515. Then he adds:

> Accordingly, the *Government* contends, the motion to compel arbitration must be denied, and the case go forward in this court pursuant to the provisions of [the PVA].

*Id.*

The Court held for reasons no one challenges, that enforcement of the "LOF" for arbitration (and deposits) was not enforceable under PVA. Consequently, the motion for an order directing the government to proceed with arbitration was denied. But the Court then added what must have pleased the government proctor but which makes chills go up and down the spine of the present advocates:

> The case will go forward in this court, in accordance with applicable maritime law as declared by the federal courts sitting in admiralty.

*Id.* at 2522.

### II.

### *Whether Stevens Has a Maritime Lien*

■ Here we address, as did *Canadian Aviator supra,* n. 3, and related text, the deferred question, *supra,* n. 12, whether under applicable admiralty principles, Stevens has a maritime lien.

The critical facts are relatively free of dispute. First, both MSC and MDL were aware of Stevens' performance. Indeed, as required, the principal contract with Atlantic, showed Stevens as a subcontractor having more than 15 percent by dollar value of the contract. More than that, they knew that Atlantic was not capable, either by facilities or experience, to do anything other than clean and repaint the ship's tanks. Compensation for the work to be done by Atlantic was approximately $579,000 and that of Stevens a like figure of $580,000. The work known to be done by Stevens, comprising Items 3 to 177, related to exten-

---

**39.** 651 F.Supp. 276 (E.D.La.1987).

**40.** *Id.* at 281–82 (footnote omitted). The court in its note 7, *Id.* at 282, did provide, *"See Marine Coatings of Alabama, Inc. v. United States,* 792 F.2d 1565, 1567 (11th Cir.1986)." *Marine Coat-* *ings* is now on appeal to the Eleventh Circuit, and has been held in abeyance pending the decision in the instant case.

**41.** 1976 A.M.C. 2514 (S.D.N.Y.1976).

sive machinery repairs for which Atlantic was not competent.

Of course, the contract covering work actually to be done by Atlantic and Stevens was fully and explicitly authorized by MTL, the operator whose operating contract included responsibility for maintenance and repair of the vessel. Further up the governmental hierarchy, it was approved by MSC. Atlantic refused to take responsibility for Stevens' work. Despite the government's effort to stick its head in the sand as though Stevens barely existed and was a complete stranger to this million dollar job, both MSC and MTL, while unhappy with Atlantic's refusal to assume any responsibility other than purely nominal, for Stevens' work, continued to deal with Stevens' representatives in discussing, testing and inspecting work done by Stevens. So upsetting was this to persons schooled in bureaucratic formalities, the MSC principal representative wrote a last redoubt memorandum "for the file" complaining bitterly of this untypical arrangement. Fortunately for the work, the job went on with close collaboration dealing with Stevens in its work by representatives of MTL and occasionally MSC.

To cap it all off, the actions of the government refute its peculiar contention that the work done by Stevens was not ordered by any party "who [was] authorized," § 971. All of the repairs were accepted and fully compensated to the dollar by MTL. MTL, in turn, had further ratification by being reimbursed with government funds through MSC.

There is thus no question about the actual performance of the repairs, the actual performance of the repairs by Stevens, and that all of this was done under a contractual arrangement initiated, authorized and accepted by competent authorities. There is no dispute the repairs were done, were done by Stevens, and were accepted and paid for by MTL and MSC.

This brings into play the Maritime Lien Act which by § 971 [42] provides "any persons furnishing repairs ... to any vessel ... upon the order of ... a person authorized by the owner, shall have a maritime lien ... which may be enforced by suit in rem." Significantly, that section concludes by providing that "it shall not be necessary to allege or prove that credit was given to the vessel." Persons "authorized by the owner," § 971, to procure repairs, supplies and necessaries, is broadly defined in § 972. [43] Since MSC–MTL's participation eliminates any question of authority under §§ 971 or 972, § 973 has little direct relevance. The 1971 amendments [44] have significant influence on strengthening MLA's presumptions in favor of the lienor.

The Court in *Gulf Oil Trading Co. v. M/V CARIBE MAR*, [45] succinctly described the operable effect of MLA:

> Section 971 ... grants a lien if necessaries are ordered by the owner "or a

**42.** Section 971 provides in full:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

**43.** Section 972, Persons authorized to procure repairs, supplies and necessaries provides:

> The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in posses-

sion or charge of a vessel shall have authority to bind the vessel.

**44.** Section 973 provides as follows (portion deleted by 1971 amendment is emphasized):

> The officers and agents of a vessel specified in [§ 972] shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel[;] *but nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of the charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.*
> 46 U.S.C. § 973 (amended 1971).

**45.** 757 F.2d 743 (5th Cir.1985).

person authorized by the owner." Section 972 states a presumption that certain individuals are authorized by the owner to order necessaries. Section 973, since the 1971 amendment, serves only to include certain other individuals in the class presumed to be authorized by the owner under section 973. Prior to the 1971 amendment, section 973 also served to qualify the presumption stated in Section 972.

*Id.* at 748.

The Court then confronted the contention that the 1971 amendments made the presumption of authority in § 972 a *conclusive* presumption. In rejecting this contention, the Court held that a principal purpose of the 1971 amendments was to statutorily eliminate the affirmative—and the theretofore judicially declared—duty of inquiry. The amendments would not enable the furnisher to overcome actual knowledge of an effective no-lien clause or contract. *Id.* at 749.

Of course, § 974 permits the affirmative waiver of a lien.[46]

In an opinion binding on this Court,[47] the Fifth Circuit in *Atlantic and Gulf Stevedores v. M/V GRAND LOYALTY,*[48] recognized the significant broadening influence of the 1971 amendments, *supra,* n. 44:

> We are of the further opinion that § 971 *et seq.* is not to be viewed through the constricting glass of *stricti juris*.... We view the legislative history of these sections to mandate a more liberal application than that which existed prior to the 1971 amendments to the Maritime Lien Act. Our review leads us inexorably to the conclusion that it was the intent of Congress to make it easier and more certain for [contractors] and others to protect their interests by making mari-

time liens available where traditional services are routinely rendered.

*Id.* at 201.

■ Since the furnisher of repairs does not have to "allege or prove that credit was given to the vessel," § 971, the absence of proof from Stevens showing that it affirmatively relied on the credit of the vessel, rather than that of Atlantic (the main contractor) is not decisive. The government's assertion comes down almost to the proposition, so urgently advanced in the framing of its questions to witnesses that, especially in view of the terms of the Atlantic contract, Stevens must have *expected* payment from Atlantic rather than from the government. Expectations that payment for the service would be made by some party other than the vessel does not vitiate a lien by one who, as permitted under § 971, is not required to prove reliance on the credit of the vessel. Indeed, expectation that a time-charterer, who ordered the bunkers, see *Gulf Oil, supra,* n. 45, or stevedoring, see *Atlantic and Gulf, supra,* n. 48, relfect that the furnisher fully expected payment in full by the time-charterer, but when it was not forthcoming, each had a maritime lien. The classic case in its simplest form involves a time-charterer who, under the charter is responsible for paying for the loading and discharge of cargo, arranges with a contracting stevedore to furnish the services including that of longshoremen. Obviously, the stevedore *expects* to be paid by the charterer. On failure of the time-charterer to pay, the stevedoring contractor has a maritime lien.[49] His earlier and initial expectations do not diminish or destroy the stevedore's maritime lien.

Since expectation of payment is of no decisive significance, all that is left of the

---

**46.** Section 974 Waiver of right to lien:
Nothing in this chapter shall be construed to prevent the furnisher of repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, or the mortgagee, from waiving his right to a lien ... at any time by agreement or otherwise.

**47.** *Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir.1981) (decisions binding on the Eleventh Circuit).

**48.** 608 F.2d 197 (5th Cir.1979).

**49.** *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 273, 60 S.Ct. 937, 940, 84 L.Ed. 1197, 1200 (1940). See also, *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.,* n. 51, *infra; TTT Stevedores v. M/V JAGAT VIJETA,* 696 F.2d 1135, 1139 (5th Cir. 1983).

government's contention is that, somehow in this commercial setting, there was a waiver of a lien as permitted under § 974, *supra,* n. 46. *Gulf Oil, supra* n. 45, in the strongest terms eliminates the possibility of a waiver being successfully urged here:

> This circuit's cases construing the waiver provision ... place a heavy burden on the litigant attempting to prove that [a claimant] waived a lien by looking to someone other than the vessel owner for payment.

*Id.* at 750.

Going on, the Court, in citing earlier Fifth Circuit cases all binding on this Court, *see supra,* n. 49, including *Sasportes,*[50] holding that "even under the best of circumstances, this position is difficult to sustain" and "because of the strong presumptions in favor of a maritime lien ... it is necessary" for one urging "such a waiver" to prove "that the creditor *deliberately intended*" to forego the valuable privilege of a maritime lien by looking solely to the personal credit of the party receiving the supplies, repairs, etc. In support of that, the Court cites in its note 9, *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.,*[51] and (as possibly binding on the Eleventh Circuit) *Gulf Trading and Transp. Co. v. Vessel,*[52] in addition to *Sasportes, supra,* note 50.

Under MLA, the repairs performed by Stevens were ordered by authorized persons, performed by Stevens, and accepted by authorized persons so that Stevens became a maritime lienor under §§ 971–973, which was not, by the Atlantic contract, or otherwise, waived under § 974.

We could perhaps simply determine by our reversal on Part I that the denial of a maritime lien under Part II be likewise reversed. Since we are convinced that the trial court was laboring under misapprehensions of the MLA on the facts, its fact-findings/conclusions are to the contrary. They lack the protection of the usual Rule 54(b) clearly erroneous standard, and a remand is called for. Consequently, the question of the existence of a maritime lien by Stevens is vacated and remanded for further consistent proceedings.

### III.

We do not reach the contention that recovery of the amounts due under PVA is barred because of the Contract Disputes Act, 41 U.S.C. § 601 *et seq.,* since it was not urged as a defense by the government, nor even argued below. Nevertheless, the admiralty court would have to determine that the controversy contains no disagreement as to the work done or price payable, especially in view of § 603:

> Appeals under paragraph (g) of [section 607] and suits under [section 609], arising out of maritime contracts, shall be governed by [46 U.S.C. §§ 741, et seq.] or [46 U.S.C. §§ 781 et seq.] as applicable, to the extent that those acts are not inconsistent with this act.

The dispute is confined to whether, for repairs fully performed, the furnisher is entitled to a lien—a question of law not within the competence of a contracting officer.

\*  \*  \*  \*  \*  \*

As to the question of relief (Part I) under PVA despite § 788, we disapprove and direct a judgment in Stevens' favor; as to the existence of a maritime lien (Part II) we vacate and remand for further consistent proceedings.

REVERSED AND RENDERED IN PART.

VACATED AND REMANDED IN PART.

---

**50.** *Sasportes v. M/V SOL DE COPACABANA,* 581 F.2d 1204 (5th Cir.1978).

**51.** 261 F.2d 861, 867 (5th Cir.1958).

**52.** 658 F.2d 363, 368 (5th Cir.1981).