**THORN'S DIESEL SERVICE, INC., Plaintiff,**

**v.**

**HOUSTON SHIP REPAIR, INC., and the United States of America, Defendants.**

**No.  CIV.A.01–A–1088–N.**

United States District Court, M.D. Alabama, Northern Division.

Nov. 26, 2002.

Richard A. Lawrence, Montgomery, AL, for Thorn's Diesel Service, Inc., plaintiff.

Thomas O. Deen, McFatridge Baker & Deen PC, Houston, TX, for Houston Ship Repair, Inc., defendant.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Michael A. DiLauro, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Robert D. McCallum, Jr., U.S. Department of Justice, Civil Division, Washington, DC, for United States of America, defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### Introduction

This cause is before the court on Defendant Houston Ship Repair, Inc.'s ("Houston") Motion for Partial Summary Judgment (Doc. # 34), and Defendant United States of America's Motion for Summary Judgment (Doc. # 35), both filed on August 16, 2002. Plaintiff Thorn's Diesel Service, Inc. ("Thorn's") filed this action in this court on September 12, 2001, and charged Houston with breach of contract and the United States with liability under the Maritime Commercial Instruments and Liens Act ("MCILA"), 46 U.S.C. §§ 31301–43. Houston filed a counterclaim against Thorn's on November 13, 2001, alleging breach of contract by Thorn's. On July 15, 2002, Houston cross-claimed against the United States (Doc. # 27) and sought indemnity from the United States in the event Houston was found liable to Thorn's. In turn, the United States filed a cross-claim against Houston on July 24, 2002, (Doc. # 31) seeking indemnification in the event that the United States is found liable to Thorn's. The Motion finally came under submission on November 12, 2002.

After reviewing the submissions of the parties, the court concludes that Houston's Motion for Partial Summary Judgment is due to be DENIED and that the United States' Motion for Summary Judgment is due to be DENIED.

### Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### Facts

The facts as presented in the submissions of the parties, viewed in a light most favorable to the nonmovant, are as follows:

#### The Contracts

The United States entered into a contract with InterOcean Ugland Management Corporation ("Ugland") for the maintenance of the S.S. Mount Washington, a Reserve Ready Force Ship. The contract price was $1,800,600. The parties amended this contract to include, at no additional cost, the conversion of two LCM–6 boats.[1] Ugland would convert one LCM–6 into a dive boat and the other into a tow boat. The United States Department of Transportation, Maritime Administration administered the contract.[2]

In November of 2000, Ugland entered into a subcontract with Houston to perform the conversion work on the two LCM–6 boats. The contract price was $1,050,983. The Maritime Administration's document entitled "Specifications for OPDS Utility Boats (OUB) Repair and Conversion Specifications", RFP # 00–G–246–028 was the contract document that governed Houston's work under the contract. Under Article 7 of the contract,

1. LCM–6 boats are amphibious landing boats that transport either equipment, cargo, or troops from ship-to-ship or ship-to-shore.

2. The LCM–6 boats are public vessels within the meaning of 46 U.S.C. § 30101(3), which defines a public vessel as "a vessel that is owned, demise chartered, or operated by the United States Government or a government of a foreign country."

Ugland would not be responsible for any additional charges beyond the contract price incurred by Houston that were not approved in a written order by Ugland's Port Engineer Rick Bullock. Bullock was Ugland's authorized representative at Houston's shipyard in Orange, Texas. As Ugland's Port Engineer for the S.S. Mt. Washington, Bullock was also the United States' representative for the ship and for the United States–Ugland contract to modify and repair the two LCM–6's assigned to the Mt. Washington.

Under its contract with Ugland, Houston's obligation to perform the conversions on the two LCM–6's included rebuilding and repairing the diesel engines and transmissions that power the LCM–6's.[3] Houston would remove the four engines from the LCM–6's and would receive four more from other sources, and, from those, six new rebuilt engines and transmissions would be used for the LCM–6 conversion process. Each LCM–6 would receive two of the rebuilt engines and transmissions, and the final two rebuilt engines and transmissions would be used as spares. Two of the original eight engines would be utilized for spare parts in the rebuilding process.

In December of 2000, Houston subcontracted with Thorn's in Montgomery, Alabama, for the rebuilding and repairing of the diesel engines and transmissions. The contract price was $29,900 for each of the six engines and transmissions, for a total of $179,400. Paragraph 2(F) of the Houston–Thorn's contract stated that "[e]ngine overhauls [will be] performed in compliance with specifications received from Houston Ship Repair Inc. (U.S.Navy)." Those specifications and the parties' compliance or noncompliance with them are at the heart of this litigation. The specifications at issue came from the contract specifications found in the Ugland–Houston contract (RFP # 00–G–246–028). Paragraph 2(F) of the Houston–Thorn's contract incorporated those specifications by reference.

The contract (RFP # 00–G–246–028) called for two inspections by Bullock at separate points during the rebuilding process. Pursuant to sections 314.4.5.3 and 451.4.5.2, the first inspection was to occur once the engines arrived at Thorn's and were disassembled and the parts cleaned with a high pressure wash. The second inspection, pursuant to sections 314.4.5.4,[4] 315.4.1.4,[5] and 451.4.5.6[6] was to occur

---

**3.** The diesel engines in question are Detroit Diesel 8–V–71–T.I model engines.

**4.** Section 314.4.5.4 provides:
  Hydro-test all engine blocks to 20 psi. Check cylinder heads and crankshafts for fractures by magnetic particle or other approved non-destructive testing. Measure and record all crankshaft journal readings. Check all block firing decks, cylinder bores and bearing bores. Check all heads for warpage and visually inspect all other engine parts. Check timing gears for wear beyond manufacturer's specifications. Prepare and submit a written report on "as found" condition, including at least all items mentioned. DO NOT proceed further until inspection is witnessed and signed-off by Owner's Representative [Bullock].

**5.** Section 315.4.1.4 provides:

  Submit a written Condition Report on "as found" condition [of transmissions], including results of NDT. Do not proceed until inspection is witnessed and signed-off by Owner's Representative.

**6.** Both the United States and Houston have cited section 451.4.5.6 as requiring a second inspection of the engines by Bullock. The plain language of that section does not even mention the word inspection. The court does note, however, that section 451.4.5.3 mentions the second inspection. Section 451.4.5.3 is identical to section 314.4.5.4. The reason for the two identical sections appears to be that section 314.4.5.4 provides the work orders for the engines that will be installed into the LCM–6's and section 451.4.5.3 provides the work orders for the two spare engines. The deposition testimony of Ronnie

when all of the engine parts were disassembled, inspected by Thorn's, and carefully checked for any defects or deviations from the manufacturer's recommendations. For the second inspection, Thorn's was to prepare and submit a written report to Bullock concerning the "as found" condition of the eight engines. Under the contract, Thorn's was not to proceed any further on the rebuilding process until Bullock inspected the engines and the parts and signed-off on any further repairs or purchases of new parts for the engines. Bullock's inspection and approval were necessary prerequisites to Thorn's purchasing any new parts for use in the rebuilt engines and transmissions.

The Houston–Thorn contract also contained provisions concerning the obligations of the parties in the event that parts from the eight engines were damaged or unusable. Paragraph 9(A) stated that "[b]asic overhaul price (engine & [transmission]) is valid subject to all major castings and components of engines and transmissions received by [Thorn's] for overhaul being non-damaged and useable or serviceable." Paragraph 9(B) stated that Thorn's "will back charge at fleet price[7] for non-useable engine and transmission parts and components and missing parts." In fact, the contract price of $29,000 per engine was based on the condition that all parts from the eight engines would be reusable. Leonard Eitelbach, Vice President Government Contracts for Houston, testified in his deposition that he understood that Houston would be responsible for back charges in the event that some of the parts removed from the eight engines were damaged or unusable and had to be replaced. Eitelbach Deposition, p. 11, lines 10–15.

Reese, a Houston employee, states that 451.4.5.3 is the correct section. Reese Deposition, p. 31, lines 9–14.

### The Actions of the Parties

After Houston and Thorn's agreed to their contract, the eight engines and transmissions were shipped to Thorn's Montgomery shop. Houston forwarded one-half of the contract price, or $89,700, to Thorn's pursuant to the contract terms. Thorn's began work on the disassembly, cleaning, and evaluation of the engines, the transmissions, and the component parts. On February 1, 2001, Bullock and Houston employees Virgil Harrell and Ronald Reese visited Thorn's shop in Montgomery. They conducted the first inspection required under sections 314.4.5.3 and 451.4.5.2 of the contract. According to the deposition testimony of Alan Baugher, manager of Thorn's, the engines and transmissions were disassembled and laid out on pallets for Bullock, Harrell, and Reese to inspect. The inspection passed without any delays or problems, despite the fact that Baugher acknowledged that Thorn's had not done the high pressure wash of the engines and the components as required by section 314.4.5.3.

Baugher also testified in his deposition that through his conversations with Bullock on February 1 he came to the conclusion that Bullock

> was giving us [Thorn's] a green light to do whatever we needed to do to complete the job, due to the fact that upon my request to him, do you need the documents of the tear-down prior to us going forward, he said he did not require that to get the engines done; that they needed the engines. I did have discussions with him about how much time he would need, notification, to come out and do any further inspection that I interpreted were required by their specifications. And he implied at that par-

**7.** Fleet price is a discounted price based on volume purchases. It is less than a list price.

ticular point, once again, that he doubted there would be any reason for him to come back.

Baugher Deposition, p. 19, line 16 to p. 20, line 6. Baugher explained further:

Question: You're saying on that day, you talked about the—are we talking now about the as-found condition report?

Baugher: That is correct.

Q: And you're telling me that that came up specifically?

A: That came up specifically.

Q: And he [Bullock] told you that it was not required?

A: That is correct.

Q: And Mr. Bullock said this to you?

A: Yes.

*Id.* at p. 20, lines 11–21. According to Baugher, Bullock made it clear that a second inspection was not required.[8] After the meeting, Bullock, Reese, and Harrell left Thorn's Montgomery shop. At no point did they return for a second inspection.

Baugher also sought to ascertain from Harrell and Reese, Houston's representatives, whether a second inspection was needed or whether Thorn's needed their authorization for the purchase of new parts. At the February 1 meeting, both indicated to Baugher that there would be no need for any further inspections. According to Baugher, he later contacted Harrell periodically to discuss the issue that new parts would be needed for the overhaul and repair of the engines and transmissions. Harrell said that Thorn's did not need to submit a request for the authority to purchase additional parts needed to complete the project. Baugher stated that Harrell told him to proceed with ordering additional parts in order to speed up the completion of the work. Relying on Bullock's representations that a second inspection was not needed, Baugher and Thorn's proceeded with the rebuilding process and ordered additional new parts as needed to complete the repair of the engines. Pursuant to Paragraph 9(B) of the Houston–Thorn's contract, Thorn's charged Houston for the new parts at fleet prices.

Harrell and Bullock were not in agreement as to who had the responsibility for the second inspection. Bullock stated that he was relying on Harrell to schedule the second inspection, yet Harrell testified in his deposition that it was the responsibility of Baugher and Bullock to arrange the second inspection. As a result, according to Thorn's, the second inspection never occurred. Despite that, Baugher understood from Harrell and Bullock's statements and actions that Thorn's was to finish the work on the diesel engines and transmissions, and finish it quickly.[9]

Thorn's thus moved ahead with the work to complete the overhaul and rebuilding of the diesel engines and transmissions. A second inspection was not performed, despite the fact that the second inspection would have revealed to both Houston and the United States exactly which new parts would be needed to replace worn or broken parts in the engines and transmis-

---

8. The Defendants intensely dispute Baugher's version of events concerning the February 1, 2001, meeting between Baugher, Reese, Harrell, and Bullock. However, in analyzing a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmovant.

9. Harrell and Bullock dispute Baugher's assertion that they authorized Thorn's to proceed without the second inspection and procure the necessary new parts to finish the work on the engines and transmissions. However, in analyzing a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmovant, Thorn's.

sions. As Thorn's needed new parts, it ordered them and charged them to Houston's account. Thorn's retained the unusable parts, and, in fact, it still retains those parts to this day.

On March 27, 2001, Thorn's delivered the first two engines to Houston's shipyard. Two more engines followed on April 3. On April 30, 2001, Houston forwarded the second payment of $89,700 to Thorn's as a final payment of the contract price. Shortly thereafter, Thorn's shipped the remaining two spare engines to Houston's shipyard. On July 26, 2001, Houston received an invoice from Thorn's in the amount of $68,608.57 in additional charges related to the overhaul of the engines and transmissions. The additional charges included $17,295.56 in expenses for marine gears and $36,981.07 for engine parts. It is these charges that are in dispute in this lawsuit.[10] Houston argues that neither Bullock, Harrell, nor Reese modified or waived the contract to eliminate the need for the second inspection. The United States contends that no one authorized by statute to procure necessaries for the two vessels actually did so. Thorn's' argument is that the actions and statements of Bullock, Harrell, and Reese amounted to a waiver or modification of the contract provision that called for a second inspection and that Bullock, as Port Engineer and representative of the Mt. Washington on behalf of the United States, authorized the procurement of necessaries for the LCM–6's, entitling Thorn's to a maritime lien against the United States.

**10.** Houston is only moving for summary judgment on the $54,276.63 in charges relating to the new marine gears and engine parts. Houston admits that the remaining $14,331.94 in charges relating to additional parts and manuals ordered by Houston and to expenses incurred at the sea trials of the two LCM–6's will have to be litigated at trial. The United States moves for summary judgment for the entire $68,608.57.

## Discussion and Analysis

### Applicable Law

1. Thorn's–Houston Contract: UCC or Common Law

An initial question raised by the parties' submissions is what law governs the contract between Thorn's and Houston. Thorn's argues that under the Supreme Court's decision in *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), a state's version of the Uniform Commercial Code ("UCC") operates to supplement admiralty and general maritime law in cases where there is no conflict between admiralty and the state's commercial law. In *East River*, the Court explained:

> Since contracts relating to the construction of or supply of materials to a ship are not within the admiralty jurisdiction (citations omitted), neither are warranty claims grounded in such contracts. State law would govern the actions. In particular the Uniform Commercial Code, which has been adopted by 49 states, would apply.

*Id.* at 872 n. 7. However, as Houston argues in its briefs supporting its Motion for Partial Summary Judgment, the application of UCC Article 2 presupposes that a contract for the sale of goods is at issue. From the facts before the court, viewed in the light most favorable to Thorn's, the contract at issue involves a combination of goods and services. Prior to applying Alabama's [11] version of Article 2, the court

**11.** The Thorn's–Houston contract of December 20, 2000, states, in writing, that disputes over the contract shall be resolved in Alabama. None of the parties have argued that Alabama's UCC or common law of contracts should not be applied to supplement general admiralty law.

must determine if the contract is one for goods, or one for services. *See Ala. Code* 7–2–102 (UCC Article 2 Sales only applies "to transactions in goods"); *Ala. Code* § 7–2–105(1) (" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . .").

The Eleventh Circuit has applied the "predominant factor" test in determining whether a contract is one for goods or services. *BMC Indus., Inc. v. Barth Indus., Inc.,* 160 F.3d 1322, 1329–30 (11th Cir.1998). Under the "predominant factor" test, the court determines "whether [the] predominant factor, [the] thrust, [the] purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g. contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Id.* (quoting *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974)). However, the *BMC* court analyzed Florida's version of the UCC in reaching a conclusion as to whether the contract at issue was for goods or for services. *Id.* The court also noted that at least one Florida state court had "implicitly adopted the predominant factor test." *Id.* at 1330.

Research has not revealed an Alabama state court decision that has adopted, either expressly or implicitly, the predominant factor test. Chief Justice Torbert discussed the test in a special concurrence in *Skelton v. Druid City Hospital Board,* 459 So.2d 818, 824–25 (Ala.1984). In *Skelton,* the issue was whether a hospital was a seller of goods, to wit, a suturing needle, that is liable under UCC warranty theories. *Id.* at 821. The majority concluded that the hospital was a seller of goods because the ambiguity in *Ala. Code* § 7–2–102's language that Article 2 applies to "transactions in goods" allowed for Article 2 to cover a "service transaction and a 'transaction in goods.' " *Id.* The majority

concluded that the hospital transaction, i.e. the use of a suturing needle in a procedure where the needle broke off in the patient's body, was both a service transaction and a transaction in goods. *Id.* The court emphasized that the word "transaction," as it is used in section 7–2–102, is much broader than a "sale" of goods. *Id.* Because a transaction is broader than a sale, the court concluded that the hospital was subject to liability under UCC warranty theories for the suturing needle used by a physician in a surgical operation. *Id.* at 822–23.

Chief Justice Torbert responded in his special concurrence:

The determinative issue in this case, however, is not whether mixed or hybrid agreements give rise to the Uniform Commercial Code (U.C.C.) implied warranties, but rather how agreements involving both a transaction in goods and a rendering of services are to be classified so that it may *then* be determined whether the U.C.C. implied warranties apply.

In *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir.1974), the Eighth Circuit Court of Appeals, in an appeal from an adjudication on the merits following a bench trial, reached the conclusion that a contract to supply and install bowling equipment was predominantly a transaction in goods, even though the amount of services involved was substantial.

*Id.* at 824 (Torbert, C.J., concurring specially) (emphasis in original). Chief Justice Torbert then listed the *Bonebrake* predominant factor test. *See supra* page 11. He noted that before UCC provisions can be applied to an issue, the court must first determine if the underlying contract at issue is "predominantly an agreement for services, in which case the U.C.C. would not be applicable, or for a transaction in goods, in which case the U.C.C. would be

applicable." *Id.* at 825 (Torbert, C.J., concurring specially).

Despite Chief Justice's Torbert's concurrence, research by this court has not revealed a case in which the Alabama Supreme Court adopts his rationale. In a case predating *Skelton, Port City Construction Co. v. Henderson,* 48 Ala.App. 639, 266 So.2d 896 (1972), the Alabama Court of Civil Appeals stated:

> [W]e first observe that the contract or agreement upon which suit was brought is in essence a contract for sale, though including an agreement for work and labor, as defined by Title 7A, Section 2–106 of the Code. Thus it is subject to be considered and to be controlled by the applicable provisions of the Uniform Commercial Code as adopted in this State.

*Id.* at 899. Without direct authority from the Alabama Supreme Court, this court is hesitant to adopt and apply the predominant factor test as Alabama's standard for determining whether a contract is for goods or for services.

Houston did cite *Princess Cruises, Inc. v. General Electric Co.,* 143 F.3d 828, 830 (4th Cir.1998), for the proposition that a contract for "inspection and repair services" on a vessel is not a contract involving the sale of goods. In *Princess Cruises,* Princess Cruise Lines contracted with General Electric for repair and overhaul services for the SS Sky Princess's main turbines, originally manufactured by General Electric. *Id.* After delays which caused Princess to cancel two cruises and after Princess paid the full contract price to General Electric, Princess sued General Electric for breach of contract. *Id.* at 831. After a jury verdict in Princess's favor, General Electric appealed. *Id.* The Fourth Circuit Court of Appeals noted that the first task of a district court in a breach of contract case involving both goods and services is to "determine wheth-

er the predominant purpose of the transaction is the sale of goods. Once the initial analysis has been performed, the court may then properly decide whether the common law, the U.C.C., or other statutory law governs the transaction." *Id.* at 832. The *Princess Cruises* court then applied the *Bonebrake* predominant purpose test and concluded that the inspection and repair contract, although it involved expensive component parts that General Electric needed to repair the turbines, was predominantly a contract for services. *Id.* at 833. The additional parts needed for the job were only incidental to the services that General Electric was providing. *Id.*

The similarities between *Princess Cruises* and the instant case are many. However, with Alabama's position on the predominant purpose test unclear and in view of the Alabama Supreme Court's holding in *Skelton,* this court is hesitant to rely on that test as the *Princess Cruises* court did. Additionally, a review of both Alabama's UCC provisions and Alabama's common law shows that there are no major distinctions in the result reached by either the UCC or the common law, regardless of which applies to Thorn's allegations. Simply put, Thorn's alleges that Houston breached the contract as modified or subject to a waiver. As a result, the court must review the law for both a waiver or a modification under the UCC and under Alabama's common law.

### A. Alabama's UCC Provisions for Modification and Waiver

Alabama Code § 7–2–209 governs modification and waiver under the UCC:

> (1) An agreement modifying a contract within this article needs no consideration to be binding.
>
> (2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form

supplied by the merchant must be separately signed by the other party.

(3) The requirements of the statute of frauds section of this article (Section 7–2–201) must be satisfied if the contract as modified is within its provisions.

(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

(5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

*Ala.Code* § 7–2–209. Under this provision, a contract for the sale of goods can be modified without any additional consideration between the parties. *See In re Hamby*, 19 B.R. 776, 782 (Bankr.N.D.Ala. 1982) ("Under the Uniform Commercial Code, the parties to a contract may modify or waive its terms without the formalities of a written contract."). The parties must comply with the Statute of Frauds, section 7–2–201, if the modification causes the contract to fall within the statute.[12] Further-

---

**12.** Alabama Code § 7–2–209 raises several interesting construction issues that may affect this case if the court concluded that the UCC applied. Namely, the original Houston–Thorn's contract was within the Statute of Frauds, i.e. a contract involving "goods" with a value of over $500. Thus, under section 7–2–209(3), does the modification have to be in writing?

The official comment is unhelpful, and it only states that " '[m]odification' for the future cannot therefore be conjured up by oral testimony if the price involved is $500.00 or more since such modification must be shown least by an authenticated memo." *Ala.Code* § 7–2–209 cmt. 3. The alleged modification at issue does not involve a change in the price, only an alleged change in a prerequisite condition. White and Summers concluded, after analyzing the identical uniform provision to section 7–2–209, that there are five possible constructions of the section:

(1) that if the original contract was within [7–]2–201, any modification thereof must also be in writing; (2) that a modification must be in writing if the term it adds brings the entire deal within [7–]2–201 for the first time, as where the price is modified from $400 to $500; (3) that a modification must be in writing if it falls in [7–]2–201 on its own; (4) that the modification must be in writing if it changes the quantity term of an original agreement that fell within [7–]2–201; and (5) some combination of the foregoing.

James J. White & Robert S. Summers, *Uniform Commercial Code* § 1–6, p. 39 (4th ed.1995). However, *Corbin on Contracts* states that section 7–2–209 should only apply "1) where the original agreement was neither memorialized in writing nor supported by any recognized exception to the statute; or 2) where the modification increases the quantity term." Caroline N. Brown, *Corbin on Contracts*, § 13.5, p. 130 (rev. ed.1997). Brown stresses that "a general rule requiring a writing to modify a prior written contract within the statute is not merely legally incorrect under the Code, but it usually produces an incorrect result and an unfair one." *Id.* at p. 139; *see also* Richard A. Lord, *Williston on Contracts*, § 29:45, pp. 781–83 (4th ed.1999) (explaining that section 7–2–209 has "effected a significant change" regarding the enforceability of written contracts, within the Statute of Frauds (section 7–2–201), that are modified orally by allowing the original writing to stand as the writing within the meaning of section 7–2–209(3)). Lord's view is that the UCC's requirements for a writing within the meaning of the Statute of Frauds are so limited in that the writing must only be signed by the parties, show that a contract exists between them, and list the quantity of goods at issue. *Id.* Thus, with such a minimal writing requirement for the original writing, a new writing for a modification is only required if the modification alters the quantity of goods at issue. *Id.* This alteration to the traditional interpretation of the Statute of Frauds is acceptable because a writing for an original contract under the UCC for the sale of goods must only list the parties (if that) and the quantity of goods. The courts can supply the other terms through the UCC. This approach has been adopted in *Costco Wholesale Corp. v.*

more, if the oral modification [13] fails to satisfy the Statute of Frauds requirement, it can still operate as a waiver, and free Thorn's from the requirement of the second inspection. *See Ala.Code* § 7–2–209(4); *West Point–Pepperell, Inc. v. Bradshaw,* 377 F.Supp. 154, 156 (M.D.Ala. 1974) (price increase is acceptable because plaintiff waived the original price term); *Brown, supra* note 12, at p. 140 ("The great majority of U.C.C. cases decided to date [on the issue of oral modification of a written contract that already satisfies the Statute of Frauds] have relied upon the waiver provision of [7–]2–209( ) to enforce contracts after modification.").[14]

■ After a review of the applicable Alabama UCC provisions, the court concludes that parties to a contract for the sale of goods can orally waive portions of their contract without having to memorialize the waiver with a writing under section 7–2–201. The court does not reach the issue of whether an oral modification of a written contract for the sale of goods requires a written memorialization under section 7–2–209(3).

## B. Alabama Common Law of Modification and Waiver

■ The Alabama Supreme Court in *Watson v. McGee,* 348 So.2d 461, 464 (Ala. 1977) stated the general rule that "[p]arties to a written contract may by mutual consent without other consideration orally alter, modify, or rescind the contract." This rule has been followed in several cases. *See Duncan v. Rossuck,* 621 So.2d 1313, 1315 (Ala.1993) (oral modification of written contract permissible, even if contract states that all modifications must be in writing); *Hall v. Integon Life Ins. Co.,* 454 So.2d 1338, 1343 (Ala.1984); *Watts Constr. Co. v. Cullman County,* 382 So.2d 520, 522 (Ala.1980); *Winegardner v. Burns,* 361 So.2d 1054, 1057 (Ala.1978); *Cooper v. McIlwain,* 58 Ala. 296, 300 (1877).[15] The parties' alterations, waivers, or modifications to a contract do not have to be express; they can be implied from the parties' actions and circumstances. *Stauffer Chem. Co. v. Brunson,* 380 F.2d 174, 182 (5th Cir.1967). Under Alabama law, parties can modify a written, executory contract with a mutual, oral agreement between the parties. *Peoples Bank &*

---

*World Wide Licensing Corp.,* 78 Wash.App. 637, 898 P.2d 347 (1995). *See* Ronald A. Anderson, *Uniform Commercial Code,* § 2–209:92, p. 64 (3d ed.1997 rev.) ("In view of the fact that the writing under the Code is so brief that it permits the terms of the sale, with only slight exception, to be proven by parol, once there is a sufficient writing to vouch for the contract itself, there seems to be little reason for refusing to give effect to the parol terms agreed upon after the initial contract was made.").

**13.** *See H.C. Schmieding Produce Co. v. Cagle,* 529 So.2d 243, 247 (Ala.1988) (Alabama's UCC parol evidence rule in section 7–2–202 does not bar introduction of subsequent agreements to a contract).

**14.** Thus, despite the interesting nature of the legal questions raised in footnote twelve, the court need not reach a conclusion on those

issues. Thorn's has claimed that Houston's waived the second inspection during the course of the first inspection, and, taking the facts in the light most favorable to Thorn's, construing the actions of Bullock, Harrell, and Reese as effecting a waiver would satisfy the requirements of *Ala.Code* § 7–2–209(4) even if it fails to satisfy the Statute of Frauds provision of section 7–2–209(3).

**15.** The parol evidence rule does not bar any oral statements regarding the alleged modification or waiver of the contract. *See Stephens v. Stephens,* 680 So.2d 329, 333 (Ala. Civ.App.1996) ("By definition, the parol evidence rule excludes only evidence of prior or contemporaneous agreements, and it has no application to subsequent agreements."); *Bell v. Washington,* 373 So.2d 865, 868 (Ala.Civ. App.1979) (parol evidence rule does not bar evidence of a subsequent oral modification of a contract).

*Trust Co. v. Coleman,* 736 F.2d 643, 645 (11th Cir.1984) (applying Alabama law); *Commercial Contractors, Inc., v. U.S. Fid. & Guar. Co.,* 524 F.2d 944, 952 (5th Cir. 1975) (applying Alabama law); *Allied Mills, Inc. v. St. John,* 275 Ala. 69, 152 So.2d 133, 135 (1963). At the time of the alleged modification or waiver of the second inspection in the Thorn's–Houston contract, the second inspection was executory. Both Thorn's and Houston had, at the time of the alleged waiver or modification, additional obligations to fulfill before their duties were completed.[16] *See Black's Law Dictionary* 321 (7th ed.1999) (defining executory contract as "[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction and sometimes memorialized by an informal letter agreement, by a memorandum, or by oral agreement").

■ Alabama's Statute of Frauds for non-UCC contracts does not apply to the Houston–Thorn's contract if the contract is construed as one for services. *See Ala. Code* § 8–9–2. The alleged modification or waiver also does not bring the contract within section 8–9–2. As a result, the alleged modification or waiver does not have to be memorialized in a writing to survive a challenge under Alabama's Statute of Frauds.

### C.   Conclusion

■ After a review of the applicable law, the court concludes that the law yields the same results for an oral modification or waiver of an executory contract under either Alabama's version of the UCC or Alabama common law. As a result, the court does not reach the question of whether the Houston–Thorn's contract is a contract for the sale of goods or a contract for the provision of services. Under either the UCC or the common law, Houston and Thorn's could orally agree to waive the second inspection, and they would not need to memorialize the waiver with a writing.

### 2.   The MCILA

### A.   Maritime Liens Against Public Vessels in the Eleventh Circuit

■ The Maritime Commercial Instruments and Liens Act, 46 U.S.C. §§ 31301–43, states, in applicable part:

Establishing maritime liens.

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

(b) This section does not apply to a public vessel.

46 U.S.C. § 31342. Section 30101 defines a "public vessel" as "a vessel that is owned, demise chartered, or operated by the United States Government or a government of a foreign country." 46 U.S.C. § 30101(3). "Necessaries" are "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. 31301(4). The plain language of section (b) of § 31342 states that the section does not apply to a public vessel. The vessels in question in this lawsuit are two LCM–6 amphibious landing crafts that are owned by the United States government and are in use with the S.S. Mt. Washington, a Ready Reserve Force Ship. The two

---

**16.** Houston had to perform a second inspection and pay the remaining one-half of the contract price. Thorn's had to complete the work on the engines and transmissions and have them delivered to Houston's shipyard in Texas.

LCM–6 landing crafts are "public vessels" within the meaning of §§ 30101 and 31342.

From the language of the statute, it would appear that Thorn's action against the United States would fail. In fact, in *Sipco Services & Marine, Inc. v. Bethlehem Steel Co.*, 892 F.Supp. 129, 130 (D.Md. 1995), the court held that the MCILA statutorily prohibits the fixing of maritime liens on public vessels. *See Hopeman Bros. v. USNS CONCORD*, 898 F.Supp. 338, 340 (E.D.Va.1995) (noting that the "simple rule of statutory construction" compels the court to conclude that, under the MCILA, a lien cannot be filed against a public vessel); *Pactherm, Inc. v. United States*, No. C 92–5022 BAC, 1994 WL 327334, *2, 1994 U.S. Dist. LEXIS 8256, at *3–5 (N.D. Cal. June 13, 1994) ("[T]he congressional codification of maritime liens for 'necessaries' in the MCILA specifically exclude[s] actions against 'public vessels.' ... Plaintiffs admit that the vessels in question are 'public vessels'; accordingly, on their face, plaintiffs' claims are precluded by subsection (b) of § 31342."); *E.J. Bartells Co. v. Northwest Marine, Inc.*, No. C92–1424D, 1994 WL 476189, *2, 1994 U.S. Dist. LEXIS 7212, at *5 (W.D.Wash. Jan.21, 1994) (explaining that the passage of the MCILA indicates that Congress intended to prohibit maritime lien claims against the United States); *I.T.O. Corp. v. United States*, 1990 A.M.C. 1439 (S.D.Tex. 1990) (" § 31342 does not afford plaintiff a lien against the [public] vessel."), *available*

at LEXIS; *see also Triton Container Int'l Ltd. v. M/S Itapage*, 774 F.Supp. 1349, 1350 (M.D.Fla.1990) ("Pursuant to subsection (b) [of § 31342], 'public vessels' are specifically excluded from the creation of a maritime lien.").

The Eleventh Circuit's understanding of the language of subsection (b) of § 31342 does not follow the above-mentioned courts, however. In *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1561 (11th Cir.1992), the court directly addressed the question of whether the MCILA prohibits the imposition of a maritime lien on a public vessel. The court concluded that subsection (b) does not bar a plaintiff from asserting a maritime lien against a public vessel. *Id.* at 1564. The court's reasoning was based on several factors.[17] First, the court reviewed the legislative history of the 1989 amendments to the MCILA and placed heavy emphasis on the statement in the history that said "this section makes *no substantive change to law.* This section does not supersede the prohibition under the Public Vessels Act,[18] the Foreign Sovereign Immunities Act, or the Suits in Admiralty Act,[19] on bringing an *in rem* action against a public vessel." *Id.* at 1562 (quoting *H. Rep.* No. 100–918, reprinted in 7 U.S.C.C.A.N. 6104, 6141 (1988) (emphasis in original)). The *Bonanni* court looked to a precedent from the old Fifth Circuit, *Illinois Central Gulf R.R. v. Southern Rock, Inc.*, 644 F.2d 1138 (5th Cir.1981).[20] In *Illinois Central*, the

---

**17.** The analysis in *Bonanni* has been questioned by several courts. *See e.g., Hopeman Bros. v. USNS Concord*, 898 F.Supp. at 339–40 (E.D.Va.1995); *Sipco Servs. & Marine, Inc. v. Bethlehem Steel Corp.*, 892 F.Supp. 129, 130 (D.Md.1995); *E.J. Bartells Co. v. Northwest Marine, Inc.*, No. C92–1424D, 1994 WL 476189, *2, 1994 U.S. Dist. LEXIS 7212, at *6 (W.D.Wash. Jan.21, 1994).

**18.** The Public Vessels Act is codified in 46 U.S.C. §§ 781–90. Section 788 provides: "Nothing contained in this chapter shall be

construed to recognize the existence of or as creating a lien against any public vessel of the United States."

**19.** The Suits in Admiralty Act is codified in 46 U.S.C. §§ 741–52. Section 741 provides: "No vessel owned by the United States ... shall, in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States ...."

**20.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d

former Fifth Circuit determined that when Congress states that it is making no substantive changes to the law, the Fifth Circuit is bound to follow previous decisions of the Fifth Circuit regardless of the implication the new wording changes to the statute may have on those previous decisions. *Id.* at 1141 & n. 4.

Relying on *Illinois Central,* the *Bonanni* court next looked to Eleventh Circuit precedents concerning the MCILA. The court first noted that "[i]n enacting [subsection (b)] of [§ 31342] of the MCILA, Congress was in essence reasserting what it perceived to be a longstanding rule against the imposition of maritime liens against public vessels, and did not intend to alter legal rights and obligations that had existed under the old Maritime Lien Act." *Bonanni,* 959 F.2d at 1563. The court looked to *Marine Coatings of Ala., Inc. v. United States,* 932 F.2d 1370 (11th Cir.1991), and *Stevens Technical Services, Inc. v. United States,* 913 F.2d 1521 (11th Cir.1990). The *Bonanni* court explained that the decisions in *Marine Coatings* and *Stevens Technical* "rejected the very rule that Congress had perceived to be in force when it enacted the MCILA" and that the two precedents have "acknowledged the availability of *in personam* actions against

the United States on *in rem* principles of liability." *Bonanni,* 959 F.2d at 1563.

In *Stevens Technical,* the plaintiff provided necessaries to a Military Sealift Command vessel, the Sealift Antarctic, a public vessel, at the request of the authorized representatives of the vessel. 913 F.2d at 1525–26. When the plaintiff was not paid for the necessaries provided, it filed suit *in personam* against the prime contractor and *in rem* against the United States. *Id.* at 1526. The plaintiff appealed the ruling of the district court that it could recover nothing on its *in rem* libel against the United States by virtue of the Public Vessels Act, 46 U.S.C. § 788. *Id.* The Eleventh Circuit proceeded at length to explain the history and genesis of the Public Vessels Act, but the important question for this court was concisely stated as: "Does § 788 [of the Public Vessels Act] in the light of [the Suits in Admiralty Act] and [the Public Vessels Act as a whole] prevent the assertion of a maritime lien for repairs to a public vessel in a [Public Vessels Act] suit *in personam* with election for *in rem* liability?"[21] *Id.* at 1527. Relying on the Supreme Court's decision in *Canadian Aviator v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945),[22] the *Stevens Technical* court concluded that "for nearly half a century

---

1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**21.** The Eleventh Circuit's decision in *Stevens Technical* is important in this case, not for its result, but, instead, for its indication of the state of the law regarding the application of maritime liens to public vessels at the time Congress amended § 31342 of the MCILA by adding subsection (b). *Stevens Technical* reveals that, at the time of the amendments, admiralty law allowed for the imposition of a maritime lien on a public vessel. Furthermore, this court's exposition on the MCILA and on Eleventh Circuit precedent is necessary because Eleventh Circuit jurisprudence does not comport with the plain reading of subsection (b) of § 31342. However, this court is bound to follow Eleventh Circuit pre-

cedent. For a thorough understanding of the historical background and caselaw governing the Public Vessels Act, please see *Stevens Technical,* 913 F.2d at 1527–34.

**22.** In *Canadian Aviator,* the plaintiff's vessel was damaged when it followed, under orders, an escorting U.S. Navy patrol boat which led the plaintiff's vessel into a submerged wreck, causing serious damage to the vessel. 324 U.S. at 216–17, 65 S.Ct. 639. The plaintiffs sought to pursue a libel against the United States under the Public Vessels Act using *in rem* and *in personam* principles. *Id.* at 217, 65 S.Ct. 639. The United States argued that it had not waived its sovereign immunity and consented to suit on a libel such as the plaintiff's. *Id.* The Supreme Court held that the United States waived its sovereign immunity through the Public Vessels Act and consented

the Public Vessels Act authorized a libel (complaint) *in personam* against the government to be determined on principles of both *in personam* and *in rem* liability under the maritime law." *Stevens Technical,* 913 F.2d at 1524. As a result of the *Stevens Technical* holding, the *Bonanni* court concluded that, at the time of the 1989 amendments to the MCILA and at the time when the legislative history stated that the amendments caused no substantive change in the law, the law allowed a supplier of necessaries to a public vessel to assert a maritime lien against the United States. *Bonanni,* 959 F.2d at 1563.

In *Marine Coatings,* the court simply followed the holding in *Stevens Technical* and stated that "section 788 [of the Public Vessels Act] does not prohibit a libel *in personam* on principles of *in rem* liability" against the United States. *Marine Coatings,* 932 F.2d at 1375. *Marine Coatings* also involved a subcontractor who provided necessaries to a public vessel and who was unpaid by the prime contractor. *Id.* at 1372–73.

Adding a further level of complication to the *Bonanni* court's interpretation of subsection (b) of § 31342 is the fact that both *Stevens Technical,* decided in 1990, and *Marine Coatings,* decided in 1991, were decided after Congress passed the 1989 amendments which added subsection (b). *Bonanni,* 959 F.2d at 1564 n. 11. In footnote eleven, the *Bonanni* court stated:

> The fact that this court decided *Stevens Technical* and *Marine Coatings* after Congress enacted the MCILA does not affect our decision here. *Stevens Technical* and *Marine Coatings* represent interpretations of laws which Congress

expressly declined to modify when it enacted the MCILA. It is not the province of this court either to ignore explicit Congressional language, or to decline to follow cases which remain the law of this circuit. Given the clear desire of Congress to exempt public vessels from coverage under the maritime lien provisions of the MCILA, however, reconsideration of the rule announced in *Stevens Technical* and *Marine Coatings* by this court en banc may be in order.

*Id.* at n. 11. Thus, relying on *Stevens Technical* and *Marine Coatings* to explain the state of the law at the time of the passage of the 1989 amendments, the *Bonanni* court determined that since Congress intended not to change the underlying substantive law, subsection (b)'s language that public vessels are not subject to maritime liens under the MCILA was inapplicable. *See Bonanni,* 959 F.2d at 1563–64 ("[B]ecause Congress did not purport to alter the rights and obligations of parties under preexisting admiralty law when it enacted the MCILA, and because we are bound to apply this court's interpretations of the preexisting law in *Stevens* and *Marine Coatings* ... we hold here that the district court erred in ... preclud[ing] the imposition of maritime liens on public vessels where an admiralty plaintiff sues the United States *in personam* on principles of *in rem* liability.").

In *Turecamo of Savannah, Inc. v. United States,* 36 F.3d 1083, 1087 (11th Cir. 1994), the Eleventh Circuit followed the *Bonanni* court's decision that the plain language of subsection (b) of § 31342 does not bar the imposition of a maritime lien against a public vessel.[23] However, the

---

to suit on *in rem* and *in personam* principles. *Id.* at 226–28, 65 S.Ct. 639. However, the government vessel at issue is not subject to arrest or seizure. *Id.* at 226–27, 65 S.Ct. 639.

**23.** *Turecamo* is similar to both *Bonanni* and the facts of this case:

Turecamo ha[d] satisfied the requirements of the MCILA, ... that is, Turecamo has demonstrated that [the contractor to the government and its subsidiary] were authorized to act for the vessel owner by showing the following: (1) Performance of towing services is a necessary within the meaning

*Turecamo* opinion, authored by Judge Sharon Blackburn, sitting by designation, explicitly called on the court to reconsider the *Bonanni* holding en banc. *Id.* at 1087–88. The court made special note of the following statement of Representative Robert W. Davis, who explained the reason for the 1989 amendments:

> Likewise, we have clarified provisions relating to maritime liens against public vessels. Although I felt that we had taken [care] of any uncertainty last year, we have rewritten section 31342 to clarify once and for all the fact that a claim may not be brought either in personal [sic] or *in rem* on a maritime lien theory against a public vessel.

*Id.* at 1086 (quoting 135 *Cong. Rec.* 9184 (daily ed. Nov. 20, 1989)). The *Turecamo* opinion further cited the following passage from the legislative history of the 1989 amendments:

> Section 31342 has been rewritten by deleting the parenthetical provisions relating to excluding public vessels from the application of the existing law and replacing it with a new subsection (b) to assure clarity. This is not a substantive change but simply makes more explicit the long established rule of law prohibiting maritime liens against public vessels. It further clarifies the existing law that a claim may not be brought either in personam or in rem on a maritime lien theory against a public vessel. This section does not affect a cause of action

against the United States based on a valid maritime lien contract.

*Id.* (quoting 135 *Cong. Rec.* 9312 (daily ed. Nov. 21, 1989)). Judge Blackburn's opinion listed five reasons that the *Bonanni* holding should be reevaluated. *Id.* at 1087–88.

First, she explained that the legislative history cited in *Bonanni*[24] which stated that the amendments "make[ ] no substantive change in the law" was written at a time that § 31342 did not explicitly exclude public vessels from facing maritime liens. *Id.* at 1087. Second, she noted that while Congress drafted the MCILA to codify existing maritime law, it also intended to make many substantive changes to the law. Specifically, the Congressional committee handling the MCILA stated that "[t]here is no mandate in logic or case laws for reliance on legislative history to reach a result contrary to the plain meaning of the statute, particularly where that plain meaning is in no way unreasonable." *Id.* (quoting *H. Rep.* No. 918, *reprinted in* 1988 U.S.C.C.A.N. 6104, 6108–109). Third, she emphasized that the legislative history clearly indicated that a claim may not be brought against a public vessel either *in personam* or *in rem*. *Id.*

Fourth, Judge Blackburn stated that "[b]ecause Congress has expressly stated its intent, it is inappropriate to second-guess Congress' view of existing law." *Id.* at 1088 (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 828, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)).[25] Finally, "[e]ven if

---

of the MCILA, ... (2) Government personnel approved the use of the tug, Cynthia Turecamo; and (3) the Government accepted the vessel upon delivery. Therefore, based upon existing Eleventh Circuit precedent, the district court correctly concluded that Turecamo had sustained its burden of demonstrating the existence of a maritime lien under the MCILA, and that Turecamo was thus entitled to recover in personam utilizing principles of in rem liability.
36 F.3d at 1087.

24. *See supra* page 1344–45.

25. Congress' language in the MCILA directly states that a maritime lien may not be imposed on a public vessel. The statutory command contained in the MCILA remains clear, even if Congress misunderstood the previous caselaw dealing with maritime liens and public vessels. As the branch of government vested with legislative powers, Congress may change the law, even if it is confused on the status of the law. *See U.S. Const.* art. I, § 1 ("All legislative Powers herein granted shall

Congress misinterpreted the existing law, Congress has now made it clear that a claim may not be brought on a maritime lien theory against a public vessel." *Id.* (citing legislative history to 1989 MCILA amendments). Despite the reasons advocated by Judge Blackburn, the Eleventh Circuit did not hear *Turecamo* en banc, and the Supreme Court later denied certiorari. *See United States v. Turecamo of Savannah, Inc.*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995).

Without further guidance from the Eleventh Circuit en banc or the Supreme Court, the holdings in *Bonanni* and *Turecamo* stand as binding law in this circuit. This court is bound to follow those holdings. The arguments of the United States contrary to those decisions must be rejected. Therefore, the court concludes that § 31342 of the MCILA does not prohibit the imposition of a maritime lien against a public vessel when all prerequisites for the lien are met.

### B. Can a Subcontractor Assert a Maritime Lien under the MCILA?

■ The Eleventh Circuit set out the test for a maritime lien under the MCILA in *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242 (11th Cir.1999). As the *Galehead* court explained, the test comes from a plain reading of the statute, § 31342. *Id.* at 1244. The test is:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner-

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

Therefore, to obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent.

*Id.* (quoting in part 46 U.S.C. § 31342). More specifically, 46 U.S.C. § 31341 lists those persons who are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by—

(A) the owner;

(B) a charterer;

(C) an owner pro hac vice; or

(D) an agreed buyer in possession of the vessel.

46 U.S.C. § 31341(a)(1)-(4). In the instant case, InterOcean Ugland had been appointed by the United States to manage and conduct the business of the S.S. Mt. Washington. As the authorized operator/manager of the vessel, InterOcean Ugland contracted with Houston for the repair and modification work on the two LCM–6's associated with the S.S. Mt. Washington. Houston, as the contractor on the LCM–6 modification project, subcontracted with Thorn's for the portion of the project involving the overhauling and repair of the diesel engines and transmissions for the LCM–6's. Accordingly, as the parties stand before the court, Thorn's, the subcontractor, is attempting to assert

be vested in a Congress of the United States ...."); *United States v. Lanier*, 73 F.3d 1380, 1385–87 (6th Cir.1996) (explaining that Congress unknowingly combined, due to an error by the author of a codification of federal statutes, three pre-existing and separate statutes into one when it codified 18 U.S.C. § 242 in 1874, and that the codification effected a major change in the law), *vacated*, 114 F.3d 84 (6th Cir.1997).

a maritime lien against the United States, the owner of the vessel. The next question, of course, is can this be done under the statute?

Not surprisingly, the courts are not unanimous in their answers. In *Port of Portland v. M/V Paralla*, 892 F.2d 825, 828 (9th Cir.1989), the Ninth Circuit stated that "[i]t is the general rule that a general contractor does not have the authority to bind a vessel." *See also Farwest Steel Corp. v. Barge Sea–Span 241*, 828 F.2d 522, 526 (9th Cir.1987) ("[W]here subcontractor suppliers have sought maritime liens, courts interpreting section 972[26] have uniformly held that the general repair contractor was not endowed with sufficient management authority to support a section 971[27] lien."); *Integral Control Sys. Corp. v. Consol. Edison Co. of New York*, 990 F.Supp. 295, 301 (S.D.N.Y.1998) (subcontractor can only assert a maritime lien against the vessel if the owner ordered the contractor to retain that particular subcontractor); *Sands Constr. Co. v. United Va. Bank*, 1985 A.M.C. 1165 (E.D.Va.1984) (subcontractor may not assert a maritime lien against a vessel), *available at* LEXIS; *The Juniata*, 277 F. 438, 440–41 (D.Md. 1922) (contractors for ship repairs do not have authority to authorize a subcontractor to provide necessaries for a vessel, and,

as a result, a subcontractor cannot assert a maritime lien against the vessel). However, under Eleventh Circuit jurisprudence, the right of a subcontractor to assert a maritime lien against a vessel for necessaries is not restricted by a rigid rule but instead depends on the degree of involvement between the owner and the subcontractor. *See Galehead*, 183 F.3d at 1246 (Eleventh Circuit "cases illustrate that a third-party provider is not entitled to a lien where the degree of involvement with the owner is minimal or nonexistent."). To determine the line between a subcontractor with minimal and nonexistent involvement with the owner and a subcontractor with sufficient involvement with the owner, this court must look to *Marine Coatings* and *Bonanni* again. *See Galehead*, 183 F.3d at 1246–47 (looking to *Marine Coatings* and *Bonanni* to determine if a subcontractor can assert a maritime lien).

In *Marine Coatings*, the court determined that there was a genuine issue of material fact as to whether the owner procured the subcontractor's work and denied summary judgment to the United States. 932 F.2d at 1376. The relevant factors for determining whether the United States procured necessaries from the subcontractor were:

26. The court is referring to 46 App. U.S.C. § 972. Section 972 was repealed in 1989, coinciding with the enactment of 46 U.S.C. § 31341. The two provisions are similar, with § 972 stating:

> The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

The language of § 31341 is at page 28 of this Memorandum Opinion.

27. This also refers to a repealed section, 46 App. U.S.C. § 971. It was also repealed in 1989, and it is substantially similar to 46 U.S.C. § 31342. Section 971 provides:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by a suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

The language of § 31342 is at page 1343 of this Memorandum Opinion.

(1) the owner of the vessel was aware of the subcontractor's performance before and during the performance;

(2) the subcontractor performed between 35% and 50% of the work performed on the vessels;

(3) the owner inspected the subcontractor's work;

(4) the owner gave provisional and final acceptance to the subcontractor's work; and

(5) the repairs were fully accepted and compensated for.

*Id.* at 1376 & n. 9; *see also Galehead,* 183 F.3d at 1245–46 (summarizing the *Marine Coatings* factors). The contract between the United States (via the U.S. Navy and the Military Sealift Command) and the contractor in *Marine Coatings* specifically did not make the contractor an agent of the government. *Marine Coatings,* 932 F.2d at 1372. The court concluded that, despite the fact that a contractor was not listed in 46 U.S.C.App. § 972 [28] as a person presumed to have authority to procure necessaries for a vessel, the involvement of the United States with the subcontractor, as evidenced by the factors listed above, was sufficient to allow the subcontractor's claim for a maritime lien against the United States proceed. [29] *Id.* at 1376–77; *see also Stevens Technical,* 913 F.2d at 1534–35 (subcontractor is entitled to maritime lien where government knew of subcontractor's performance, the contract identified subcontractor as an entity having 15% (by dollar value) or more of the contract, the government knew that the contractor lacked the facilities and equipment to complete the project without the subcontractor, and the government dealt with subcon-

tractor's representatives for testing and inspection the subcontractor's work).

On the other hand, in *Bonanni* the Eleventh Circuit granted summary judgment to the United States on a maritime lien claim asserted by a subcontractor. 959 F.2d at 1565. The court noted that no written contract existed between the subcontractor and the United States regarding the work on the vessel at issue. *Id.* at 1559. Furthermore, there was no oral agreement between the United States's contracting officers and the subcontractor, and the government neither inspected the subcontractor's work nor knew that the subcontractor was performing the work. *Id.* None of the government's contracting officers directed the subcontractor to perform any work on the vessel. *Id.* In fact, the only "officers authorized to engage the services of [a subcontractor] or any other contractor were ... the [ship's] contracting officer, ... the Master of the [vessel], and ... the [vessel's] Port Engineer." *Id.* at 1559 n. 2. Because none of these authorized officers approved of the subcontractor's work, the subcontractor could not assert a maritime lien against the United States under the MCILA. *Id.* at 1565.

From the Eleventh Circuit's guidance in *Bonanni* and *Marine Coatings,* the court concludes that a subcontractor can assert a maritime lien against the United States (as the owner of a public vessel) for necessaries provided to the vessel if the subcontractor meets the requirements explained in *Marine Coatings* or if a person authorized to procure necessaries for a vessel approves the subcontractor's services. Under that standard, this court must now determine whether the facts of the instant

---

**28.** Despite the repeal of this section, *Marine Coatings* remains instructive on this issue because 46 U.S.C. § 31341 closely follows the language of the repealed section.

**29.** The court in *Integral Control Systems Corp.* described the *Marine Coatings* holding on the subcontractor's ability to assert a maritime lien against the government as "outside the mainstream of American admiralty jurisprudence." 990 F.Supp. at 301.

case are more analogous to *Bonanni* or to *Marine Coatings*. *See Galehead*, 183 F.3d at 1246 (noting that, in determining whether subcontractor can assert maritime lien against vessel owner, the court must determine whether the facts are "more like *Bonanni* ... [or] *Marine Coatings or Stevens Technical* ").

*Application of the Law to the Facts*

■ From the court's conclusions that subsection (b) of 46 U.S.C. § 31342 does not prohibit the imposition of a maritime lien against a public vessel and that a subcontractor can assert a maritime lien against a vessel or the government, the court begins with the *Galehead* test for a maritime lien: "[T]o obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent." *Id.* at 1244. First, it is abundantly clear that Thorn's provided necessaries to the vessels in question, the two LCM–6 landing crafts. Thorn's repair and overhaul work on the engines and transmissions was essential to making the crafts useful to the government. According to Thorn's complaint, the modified LCM–6's are in use today by the United States in the waters near San Diego, California. Furthermore, Thorn's work in repairing and overhauling the engines and transmissions falls within the statutory definition of necessaries found in 46 U.S.C. 31301(4). The court thus concludes that Thorn's has met the first prong of the *Galehead* maritime lien test.

[8] Second, the necessaries provided by Thorn's were provided to the vessels, the two LCM–6's, owned by United States. It is true that the engines and transmissions were removed from the hulls of the two LCM–6's and from additional sources and shipped inland to Montgomery, Alabama. Additionally, there is no indication that Thorn's actually performed work on the vessels themselves, except through an agent employed by Thorn's for sea trials.

Nonetheless, the engines and transmissions are an integral part of the LCM–6's. When Thorn's completed the engine repair and overhaul work, the engines and transmissions were immediately installed into the LCM–6's by Houston at its shipyard in Texas. In fact, as deposition testimony indicated, Houston was in great need of getting the engines delivered so that further refitting and modifications could be finished. Without the engines in place, Houston had to delay work on the LCM–6's. The court is satisfied, for purposes of summary judgment, that Thorn's fulfilled the second prong of the *Galehead* maritime lien test, namely that the necessaries were actually provided to the vessel subject to the lien claim.

■ The third prong of the test, that necessaries were provided on the order of the owner or agent of the vessel, is the key issue in dispute in this lawsuit. In a nutshell, Thorn's argues that Houston and InterOcean Ugland's Port Engineer, Bullock, modified the contract between Thorn's and Houston, or, alternatively, waived the condition that a second inspection occur before Thorn's could utilize and charge Houston for additional new parts needed for the engines and transmissions. Thorn's also contends that Bullock, as Port Engineer, was an agent of the United States, or, alternatively, a person authorized under the statute, 46 U.S.C. § 31341, to secure necessaries for the vessels. These allegations are at the center of Thorn's breach of contract claim against Houston and its MCILA action against the United States. As to the breach of contract action, Houston contends that it did not modify or waive any conditions under the contract. As to the MCILA action, the United States argues that Bullock did not authorize the necessaries, or, alternatively, was not a person who could legally secure necessaries for the vessels.

In essence, the parties' respective positions have distinctly outlined two genuine issues of material fact. First, there is the question of whether the contract between Houston and Thorn's was waived or modified through the actions and statements of Reese, Harrell, and Baugher. Bullock, although a representative of Ugland, a nonparty to the Houston–Thorn's contract, had an important role as the representative of the Mt. Washington, and his authority to waive or modify provisions in the Houston–Thorn's contract is not clear. At times, the deposition testimony of Houston's representatives implied that Houston was granting Bullock the power to determine if a second inspection was needed, and, if not, to waive or modify the provisions in the contract calling for a second inspection. To resolve this issue, the court would have to make difficult credibility determinations—decisions that are inappropriate at the case's current posture.

As the court explained above, Houston and Thorn's have the legal authority to waive or modify their contract under either Alabama common law or Alabama's version of the UCC.[30] Thus, the only question is whether the parties did modify or waive portions of their contract. Under the version of the facts most favorable to Thorn's, a reasonable trier of fact could determine that the parties did waive the second inspection and did consent to the use of additional new parts for the engine and transmissions. Accordingly, Houston's motion for summary judgment is due to be denied.

Second, there is the question of whether Bullock, as Port Engineer for the Mt. Washington, authorized Thorn's to provide necessaries, to wit, additional new parts for the engines and transmissions, to the two LCM–6 boats. Under its contract with the United States, Ugland was appointed to manage the Mt. Washington. To accomplish this task, Ugland designated Bullock as the Port Engineer for the Mt. Washington. In his capacity as Port Engineer, Bullock oversaw the work on the two LCM–6 boats as both the official representative of the Mt. Washington and as a representative of the shipowner, the United States. The United States candidly admits on page three of its Reply to Plaintiff's Response to Defendants' Motions for Summary Judgment that "[i]t is undisputed that the Owner's Representative/Port Engineer, Mr. Ricky Bullock, is the only person who had the authority to procure necessaries for the repair and conversion of the two LCM–6 boats on behalf of the Government." Pursuant to 46 U.S. § 31341(a)(3), Bullock is a person authorized to secure necessaries because he is "entrusted with the management of the vessel at the port of supply" on behalf of Ugland. *See also Galehead,* 183 F.3d at 1245–46 (third-party subcontractor can assert a lien when the person or entity authorized to procure necessaries for a vessel is either aware of and involved with subcontractor's work or authorizes subcontractor's work).

Baugher testified in his deposition that Bullock told him at their February 1st meeting that a second inspection was not needed. By waiving the second inspection, Bullock was authorizing Baugher and Thorn's to continue work on the engines and transmissions and, if needed, replace any additional worn or unusable parts with new ones. In its brief, the United States indicated that if any new parts would be

---

**30.** There is no indication that Houston employees Reese or Harrell lacked the authority to modify or waive portion of the Houston–Thorn's contract. Baugher dealt with Harrell on a daily basis and relied on him to determine if he needed to submit any additional requests to purchase new parts for the project. According to Baugher, Harrell stated that no additional requests were necessary.

needed, a second inspection should have occurred. Conversely, if the United States, through Bullock, waived the second inspection, it logically follows that Thorn's could order new parts for the engines and transmissions. As Thorn's counsel noted in his brief, the United States has essentially taken the position that three people, Bullock, Harrell, and Reese, have said that Bullock did not waive the second inspection or authorize the purchase of additional new parts. The simple fact that those three outnumber the one person, Baugher, who testified that Bullock did waive the second inspection and authorize the purchase of new parts does not entitle the United States to summary judgment. In fact, such a disagreement mandates that this court deny summary judgment.

Analyzing the facts in the light most favorable to Thorn's and applying the *Galehead* test for authorization of necessaries, the court concludes that a reasonable trier of fact could determine that Bullock was either aware of and involved in Thorn's actions in supplying necessaries to a vessel or authorized Thorn's to supply necessaries to a vessel. First, Bullock was aware of the role that Thorn's was performing on the conversion of the LCM–6 boats. Second, Bullock had inspected Thorn's facilities and its work on one occasion. Third, Bullock accepted Thorn's work by overseeing the installation of the engines and transmissions that Thorn's rebuilt into the LCM–6 boats. Fourth, Houston compensated Thorn's for its work from funds supplied by the United States, owner of the LCM–6 boats. Fifth, Thorn's completed approximately 17% of the contract work, by dollar value, on the LCM–6's.[31] *See Stevens Technical*, 913 F.2d at 1534 (knowledge that a party was to perform 15% or more of the contract work

was a factor in showing owner's knowledge and authorization to subcontractor to provide necessaries to a vessel). While the 17% figure is less than the *Marine Coatings* percentage, the factor still weighs in favor of Thorn's. *See Galehead*, 183 F.3d at 1245–46 (explaining that the following facts were material in *Marine Coatings* to determine if a shipowner was subject to a lien for necessaries provided by a subcontractor: "(1) the owner of the vessel was aware of the subcontractor's performance before and during the performance; (2) the subcontractor performed between 35% and 50% of the work performed on the vessels; (3) the owner inspected the subcontractor's work; (4) the owner gave provisional and final acceptance to the subcontractor's work; and (5) the repairs were fully accepted and compensated for" (citing *Marine Coatings*, 932 F.2d at 1376 & n. 9)). Under Thorn's version of the facts, the factors from *Marine Coatings* and *Galehead* weigh in favor of Thorn's and against the United States. Accordingly, summary judgment for the United States is inappropriate.

### Order

With issues of fact to be decided by the trier of fact which are material to whether Houston breached its contract with Thorn's, the court finds that Houston's Motion for Partial Summary Judgment is due to be and hereby is ORDERED DENIED. Genuine issues of material fact also exist on Thorn's claim that it is entitled to a maritime lien under the MCILA against the United States. As a result, the court finds that the United States' Motion for Summary Judgment is due to be and hereby is ORDERED DENIED.

---

**31.** The 17% figure was determined by dividing 179,400 (the price of the Houston–Thorn's contract) with 1,050,893 (the price of the Ugland–Houston contract). If the additional charges that Thorn's seeks in this lawsuit are added, the percentage increases to 24%.

## ORDER

Upon consideration of Houston Ship Repair, Inc.'s Motion to Limit Evidence (Doc. # 62), and responses thereto, the court finds that the motion is due to be denied. The Complaint in this case was sufficient to put the Defendants on notice of the Plaintiff's modification or waiver theory which, if proved, could sustain a breach of contract claim. While the existence of this theory could have been more fully explored through discovery, including contention interrogatories, the court feels that neither a prohibition against asserting this contention at trial nor, on the other hand, requiring the Defendants to proceed to trial as scheduled without additional discovery they may feel is needed, would be appropriate. Therefore, it is hereby ORDERED as follows:

1. The Motion to Limit Evidence is DENIED.

2. The court will continue the trial of this case to a later date and will give the Defendants the opportunity for further discovery which they contend would have been conducted if the Plaintiff's modification or waiver theory had been clearly expressed in the Complaint, if either or both of the Defendants request it.

3. Defendants are given until noon on December 3, 2002 to file with the court a motion for continuance and for additional discovery.